[No. 52045–3.   En Banc.   May 29, 1986.]

PENINSULA COUNSELING CENTER, ET AL, *Respondents*, v. KAREN RAHM, *as Secretary of the Department of Social and Health Services, Appellant.*

Kenneth O. Eikenberry, Attorney General, and Mary C. Barrett and Karen McCarty Lundahl, Assistants, for appellant.

Steve W. Berman (of Bernstein, Litowitz, Berger & Grossmann) and Frances E. Pennell (of Shidler, McBroom, Gates & Lucas), for respondents.

GOODLOE, J.—In 1982, the Legislature passed the Community Mental Health Services Act (RCW 71.24). This act establishes a comprehensive mental health program which provides patients access to state subsidized mental health facilities. Because of the amount of state funding involved, the act specifically attempts to ensure "[a]ccountability of services through state–wide standards for management, monitoring, and reporting of information . . ." RCW 71.24-.015(2). This requirement is especially important because the State, pursuant to a recent change in administration of federal funding, receives "block" grants from the federal government, and these grants are contingent upon the State's "use [of] the funds provided only for the purposes specified in the approved [state] application". Significantly, the State must "establish such fiscal control and fund accounting procedures as may be necessary to assure proper disbursement and accounting of Federal funds paid to the [state]." 42 U.S.C. § 300x–1(a)(2).

Although the State has not had any funds disallowed, the Department of Social and Health Services (DSHS) has

been concerned about the current reporting system, and has attempted to implement a more detailed accounting system for patients receiving state and federal aid. Currently, DSHS receives aggregate information from the mental health centers on the number of clients the centers treated and the service units the centers provided, without actually finding out the names of the patients. Thus, DSHS is not aware whether a patient receiving mental health services at one center is also receiving services at another center.

Under certain limited circumstances, DSHS will receive the names and look at the actual files of mental health patients. During an audit of the mental health center, the auditors may check an individual's records to ensure the services have been provided, but the auditors are bound by confidentiality agreements and the patients may have their names obliterated when their files are being checked. Furthermore, to determine eligibility for Medicaid, patients may make direct disclosures to the State. The trial court found, however, that these disclosures to the State "differ substantially in degree and quality" from the diagnosis and treatment based disclosures. Clerk's Papers, at 19.

The new Community Mental Health Services Act, and the regulations enacted to implement it, would increase the amount of disclosure by certain types of patients because of the requirement that DSHS

> [d]evelop and maintain an information system to be used by the state and counties which shall include a tracking method which allows the department to identify mental health clients' participation in any mental health service or public program. . . . Confidentiality of client information and records shall be maintained [pursuant to various statutes] . . .

RCW 71.24.035(4)(h). DSHS adopted two regulations, WAC 275–56–055 and WAC 275–56–060, which required mental health centers to provide specific information to DSHS for "priority patients" (patients meeting a statutory definition of acutely ill, chronically mentally ill, or seriously

disturbed, RCW 71.24.025), including the patient's name, birthdate, places to which the center referred the patient, and classification of the patient's diagnosis. DSHS will not use this raw data in subsequent evaluations (unless individual contact became necessary), but will instead create a "PICCODE" which will uniquely identify each patient by code. Allegedly only four people will have access to the raw data; the rest will use the PICCODE.

The data will be used for two different purposes. First, DSHS will develop two data bases called CMHIS (Community Health Information System) and CCIS (Common Client Identification System) to obtain unduplicated lists of patients using the state funded system, and to help plan for future development of state mental health care. A person would remain in the data base for 5 years after treatment.

Secondly, chronically mentally ill patients also would be required to participate in a tracking program. Tracking would help determine if mental health funds were effectively spent and would help ensure patients received continuity of care. The tracking system requires county health facilities to give the State the name of any patient the facility discharged or referred to another facility. After the patient has been discharged and DSHS has been notified, no further action is taken, WAC 275–56–060(1), although the patient also remains on the data base for 5 years. If the patient was referred, the receiving facility must tell the State whether or not the patient arrived. WAC 275–56–060(2). If the patient did not arrive, the receiving agency may take steps to contact the patient, including the possibility of a phone call or a visit.

Peninsula Hospital, the Washington Mental Health Council, Seattle Counseling Service, and two unidentified patients brought a suit to enjoin DSHS from carrying out these tracking systems (known overall as CMHTS—Community Mental Health Tracking System). They alleged these disclosures of name and diagnosis to the State violated the patients' rights to privacy under the United States and Washington State Constitutions. Furthermore,

the respondents assert that the effect of requiring disclosure would have a chilling effect on the mental health care system and would result in patients declining needed mental health care. Finally, the respondents claim that DSHS could implement a system which "tracked" patients and provided more detailed records through less intrusive means. Specifically, DSHS could have the individual health centers encode the patient's name, birthdate, sex, diagnosis, etc., and send that code, rather than the raw data, to the State.

The trial court judge agreed with respondents and granted their prayer for a preliminary and permanent injunction. The trial court also granted the respondents attorney fees of $30,000 pursuant to 42 U.S.C. § 1988. The State and DSHS have appealed to the Court of Appeals, which certified this case to this court.

Respondents have asserted that they have a constitutional right to privacy which would preclude the county health authorities from giving patients' names and diagnoses to DSHS. Respondents base this right on the personal nature of the information DSHS is requesting. Specifically, the respondents believe that the fact that a patient is undergoing treatment for mental illness is confidential, and this confidentiality is required in order to have psychiatric treatment succeed.

The United States Supreme Court has recognized that a right to privacy exists in certain situations. *Meyer v. Nebraska,* 262 U.S. 390, 67 L. Ed. 1042, 43 S. Ct. 625, 29 A.L.R. 1446 (1923); *Roe v. Wade,* 410 U.S. 113, 35 L. Ed. 2d 147, 93 S. Ct. 705 (1973). It is equally true, however, that the United States Constitution does not guarantee a general right to privacy. *Katz v. United States,* 389 U.S. 347, 350, 19 L. Ed. 2d 576, 88 S. Ct. 507 (1967). Rather, this right has been limited to a core group of privacy rights which receive constitutional protection. These privacy rights fall into two different categories. First, individuals should be allowed the autonomy to make certain fundamental decisions without government intrusion (abortion,

contraception, education, etc.). Secondly, they should also be protected from disclosure of certain personal matters to the government. *Whalen v. Roe,* 429 U.S. 589, 599–600, 51 L. Ed. 2d 64, 97 S. Ct. 869 (1977).

A variety of cases dealing with psychiatrist–patient relationships have emphasized the need for confidentiality between the psychiatrist and the patient. *Caesar v. Mountanos,* 542 F.2d 1064 (9th Cir. 1976); *In re Lifschutz,* 2 Cal. 3d 415, 467 P.2d 557, 85 Cal. Rptr. 829 (1970); *In re Zuniga,* 714 F.2d 632 (6th Cir. 1983). Ample evidence, both from prior cases and from testimony at this trial, has shown that disclosure of communication between a psychiatrist and a patient would deter a small but significant number of individuals from seeking much needed care, and the potential disclosure would prevent other individuals from participating fully once therapy began. *Hawaii Psychiatric Soc'y v. Ariyoshi,* 481 F. Supp. 1028 (D. Hawaii 1979).

Nevertheless, this need for confidentiality does not necessarily mean that a statute requiring disclosure would violate the federal constitution. In *Whalen v. Roe, supra,* certain doctors challenged a New York statute requiring doctors to send a copy of a prescription as well as the name, address, and age of a patient to the state health department, when the prescription was for certain potentially abusable types of drugs. The disclosure of the patient's name, even if it intruded into the confidential doctor–patient relationship, and even if it would deter some patients from obtaining medically beneficial prescriptions, did not raise the privacy interests to a constitutional level.

> [D]isclosures of private medical information to doctors, to hospital personnel, to insurance companies, and to public health agencies are often an essential part of modern medical practice even when the disclosure may reflect unfavorably on the character of the patient. Requiring such disclosures to representatives of the State having responsibility for the health of the community, does not automatically amount to an impermissible invasion of privacy.

(Footnote omitted.) *Whalen,* at 602. Other cases agree that

disclosure of certain medical information does not, in itself, rise to constitutional dimensions. *Department of Social & Health Servs. v. Latta,* 92 Wn.2d 812, 601 P.2d 520 (1979) (disclosure of minor's medical records pursuant to Medicaid audit not a constitutional privacy violation); *In re R.,* 97 Wn.2d 182, 641 P.2d 704 (1982) (questioning whether constitutional privacy right applies to statutory waiver of physician–patient privilege in involuntary detention proceedings); *Schachter v. Whalen,* 581 F.2d 35 (2d Cir. 1978) (disclosure of Laetrile prescriptions to state authorities permissible).

However, certain more intrusive disclosures to government authorities have violated the constitutional right to privacy of the individuals involved. In *Hawaii Psychiatric Soc'y,* the federal District Court held that comprehensive disclosure of patients' files and psychological profiles pursuant to an audit of medical records did violate the patients' right to privacy. The court held "[t]he unique personal character of the disclosures distinguished the case from *Whalen.*" *Hawaii Psychiatric Soc'y,* at 1044. It was apparent that the court was concerned that the amount of disclosure required far exceeded the amount needed for an audit. In *Thorne v. El Segundo,* 726 F.2d 459 (9th Cir. 1983), a police department asked intimate questions about an applicant's sex life. Although the questions were supposedly needed in order to maintain the morale and integrity of the police force, the court held they were far more intrusive than necessary, and violated the applicant's right to privacy.

██ The theme in all these cases is the same. While disclosure of intimate information to governmental agencies is permissible if it is carefully tailored to meet a valid governmental interest, the disclosure cannot be greater than is reasonably necessary. *See further McKenna v. Fargo,* 451 F. Supp. 1355, 1381 (D.N.J. 1978); *United States v. Westinghouse Elec. Corp.,* 638 F.2d 570, 578 (3d Cir. 1980). We therefore must decide whether DSHS has required disclosure of more information than is reasonably needed in

order to maintain an efficient auditing and tracking system. ■ We believe it has not, and therefore reverse the lower court's findings. The federal government has specifically required adequate accounting systems to ensure federal funds are actually spent in treating mentally ill patients. Furthermore, without question the State has an interest in maintaining adequate mental health facilities and ensuring care for individual patients. *See Tarasoff v. Regents of Univ. of Cal.,* 17 Cal. 3d 425, 551 P.2d 334, 131 Cal. Rptr. 14 (1976). These centralized records are kept strictly confidential and include no more than the patient's name and diagnostic code. They are not overbroad and are carefully tailored to meet the State's legitimate, and laudable, interests.

We recognize that the respondents presented evidence that the individual health centers could encode the information before sending the code to DSHS. While the trial court found this code could be used to obtain an unduplicated count of patients as well as tracking patients who are given referrals, such a system undoubtedly would be more cumbersome and error prone than having one centrally located encoding system. Although we recognize the importance of the impression of absolute confidentiality in these cases, it is nonetheless true that, unless individual contact becomes necessary, only a handful of DSHS officials will have access to the raw data. These officials will be subject to civil penalties *for violation of the confidentiality of this* information. RCW 71.05.390. In *In re Zuniga, supra,* this type of information was disclosed to a grand jury investigating a doctor's medical billing records despite his objections without violating the patients' right to privacy. The secrecy of the grand jury proceedings, coupled with the limited disclosure required, justified such an intrusion. We believe the same rationale is controlling here.

We therefore hold that the trial court erred when it granted a preliminary and permanent injunction prohibiting DSHS from imposing its new regulations. While we realize that the respondents present Const. art. 1, § 7, and

due process arguments for upholding the trial court's verdict, we find them equally unpersuasive. The limited nature of this disclosure, carefully tailored to meet the legitimate goals of the State, justifies the resulting intrusions into the admittedly private affairs of the patients.

Respondents brought this action in part under 42 U.S.C. § 1983 *et seq.* Pursuant to 42 U.S.C. § 1988, the prevailing party in a civil rights case may receive attorney fees. As we have reversed the trial court's decision, respondents are not the prevailing party and, therefore, cannot receive attorney fees pursuant to 42 U.S.C. § 1988.

We remand this case to the trial court to enter an order denying the respondents' request for a preliminary and permanent injunction.

DOLLIVER, C.J., and UTTER, DORE, ANDERSEN, CALLOW, and DURHAM, JJ., concur.

PEARSON, J. (dissenting)—In this information–intensive society, dependent upon the marvels of the modern computer, we frequently exhibit indifference toward intrusions into our personal privacy. Confronted with ever–advancing technological developments, we have resigned ourselves to the inevitability of our private affairs appearing on silicon microchips in computers too numerous to count. The majority's opinion reflects this societal apathy, holding that the disclosure of a mental health patient's name and diagnosis to the State does not violate the state or federal constitutional right of privacy. I must dissent. In my opinion, Const. art. 1, § 7 prohibits the compelled disclosure of personal information to the State in the manner contemplated by the Community Mental Health Tracking System (CMHTS).

I

A noted Russian author of this century, writing of his home country, once wrote:

As every man goes through life he fills in a number of forms for the record, each containing a number of

questions. . . . There are thus hundreds of little threads radiating from every man, millions of threads in all. . . . Each man, permanently aware of his own invisible threads, naturally develops a respect for the people who manipulate the threads.

A. Solzhenitsyn, *Cancer Ward* 189 (1968). The majority opinion sanctions the attachment of yet another thread to citizens of this state, ignoring the existence of a less intrusive means of effecting an admittedly legitimate state interest.

Computers, the machines from which these threads emanate, permit the analysis and centralized storage of each individual's record, in effect creating a "dossier" on practically every individual in the United States. In fact, "[t]he average American may be the subject of between ten and twenty individual 'dossiers' . . . Americans generally dislike the term dossier. The computer data of today, however, is the dossier of tomorrow." Solomon, *Personal Privacy and the "1984" Syndrome,* 7 W. New Eng. L. Rev. 753, 754–55 (1985). Although frightening, "[t]he fact is that many Americans are now the subject of a 'womb–to–tomb' dossier." (Footnote omitted.) Solomon, at 760.

So what is objectionable about permitting the government to collect and store, in dossier form, information on each and every individual in this country? As pointed out by one student author, "[t]he mere collection and retention of sensitive or personal information creates a state of severe psychological insecurity." Comment, *The Privacy Act of 1974: An Overview and Critique,* 1976 Wash. U. L.Q. 667, 674. Another commentator warns of a "record prison psychology" in this country, noting that "[p]revious dictatorships have repressed society with machine guns, tanks, and armies, but repression may come in the form of an Orwellian psychology, with data banks and dossiers." Solomon, at 760. As put by Judge Bazelon, "tyrannies thrive by granting great secrecy to government but very little to individuals, while democracies thrive by opening government to public scrutiny and closing citizens' lives to governmental prying."

(Footnote omitted.) Bazelon, *Probing Privacy,* 12 Gonz. L. Rev. 587, 592 (1977).

As the foregoing suggests, each additional "thread" that attaches to an individual lessens his own psychological security and invites governmental abuse. Viewed this way, the CMHTS is not as benign as the majority would like to believe. The ratification by law of each new thread simply invites additional threads. Approval of one makes it that much easier to sanction the next. When viewed in isolation, a particular privacy invasion may seem harmless, but when each isolated invasion is added to all other "harmless" invasions, the resulting society begins to mirror that which George Orwell contemplated in his novel, *1984.*[1] G. Orwell, *1984* (1932).

If this society is to avoid Orwell's frightening forecast, and retain any modicum of personal privacy, infringements upon privacy cannot be accepted as an inevitable outgrowth of technological advancement. As the final arbiter of our state's constitution, it is our duty to ensure that, pursuant to article 1, section 7, the citizens of our state enjoy this cherished right to the extent possible in a civilized society.

## II

The concept of privacy was not recognized at English common law. Samuel D. Warren and Louis D. Brandeis first introduced the idea of a legal right to privacy on a national level in a law review article, Warren & Brandeis, *The Right to Privacy,* 4 Harv. L. Rev. 193 (1890). According to Warren and Brandeis, the very "right to life has come to mean the right to enjoy life,—*the right to be let alone . . .*" (Italics mine.) Warren & Brandeis, at 193.

---

[1]This is not mere melodrama. Informational specialists already have proposed that each American be assigned a "birth number" at the time of birth, and that each birth number correspond to a central computer data bank containing each individual's personal information, including medical records. A. Miller, *Assault on Privacy* 4 (1971). This birth number conceivably could correspond to a data bank containing all aspects of our private lives, and "be used as a leash around our necks". Solomon, *Personal Privacy and the "1984" Syndrome,* 7 W. New Eng. L. Rev. 753, 761 (1985).

According to them,

> [t]he intensity and complexity of life, attendant upon advancing civilization, have rendered necessary some retreat from the world . . . so that solitude and privacy have become more essential to the individual; but modern enterprise and invention have, through invasions upon his privacy, subjected him to mental pain and distress, far greater than could be inflicted by mere bodily injury.

Warren & Brandeis, at 196. Thus, although the right previously had not been recognized, Warren and Brandeis believed that "[p]olitical, social, and economic changes entail the recognition of new rights, and *the common law, in its eternal youth, grows to meet the demands of society*." (Italics mine.) Warren & Brandeis, at 193.

Professor William L. Prosser later defined four privacy torts that subsequently emerged in American jurisprudence. Prosser, *Privacy,* 48 Calif. L. Rev. 383, 389 (1960). Although the tort of public disclosure of private facts "may be most applicable to computer cases and the abuses that are likely to arise in modern medical record systems", Solomon, 7 W. New Eng. L. Rev. at 775, the existence of a tort remedy does not satisfactorily answer the question of whether disclosure of particular information should be compelled from an individual by the government in the first place. To answer this question, we must further define the nature of privacy.

Professor Westin defines privacy as "the claim of individuals, groups, or institutions to determine for themselves when, how, and to what extent information about them is communicated to others." A. Westin, *Privacy and Freedom* 7 (1967). Professor Westin also identifies four reasons why this privacy is essential to the individual. First, it preserves the individual's personal autonomy. Second, it facilitates emotional release from the pressures of daily life. Third, it makes possible self–evaluation, including the exercise of conscience. Finally, privacy permits an individual to engage in limited and protected communication, thus enabling the

individual to share confidences. A. Westin, at 33–39. As noted by the majority, the law already recognizes that individuals should be allowed the autonomy to make certain decisions, and that they also should be protected from the disclosure of certain personal matters to the government. Majority opinion, at 933–34. Both of these interests clearly are implicated in this appeal.

## III

The issue in this appeal is whether the forced disclosure of a patient's name and diagnosis to the State violates the patient's right of privacy under our constitution. To determine the constitutionality of the CMHTS under article 1, section 7, this court must delineate the scope of nondisclosural privacy by addressing three questions: (1) What kind of information does the right protect? (2) Under what circumstances does the right protect the information? (3) What standard of review applies to state action that violates the right of nondisclosural, or informational, privacy? I will answer each question in turn.

The Supreme Court has established that the constitutional right of privacy protects only "fundamental" privacy interests. *See Roe v. Wade,* 410 U.S. 113, 152, 35 L. Ed. 2d 147, 93 S. Ct. 705 (1973). The Court also has stated that a right is "fundamental" if the abolition of the right would violate the "'principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.'" *Palko v. Connecticut,* 302 U.S. 319, 325, 82 L. Ed. 288, 58 S. Ct. 149 (1937) (quoting *Snyder v. Massachusetts,* 291 U.S. 97, 105, 78 L. Ed. 674, 54 S. Ct. 330, 90 A.L.R. 575 (1934)).

In *Whalen v. Roe,* 429 U.S. 589, 599, 51 L. Ed. 2d 64, 97 S. Ct. 869 (1977), a case in which the Supreme Court first distinguished between an individual's interest in autonomy and an individual's interest in nondisclosure, the Court recognized "*the individual interest in avoiding disclosure of personal matters*". (Italics mine.) Anomalously, the Court later noted that the government's duty to keep

information private was only "arguably" constitutional, *Whalen,* at 605, thus apparently taking away with one hand what it had given with the other. Accordingly, it is unclear whether, under the federal constitution, the individual has a "fundamental" privacy interest in avoiding disclosure of personal matters. *See California Bankers Ass'n v. Shultz,* 416 U.S. 21, 39 L. Ed. 2d 812, 94 S. Ct. 1494 (1974).

Regardless, I believe citizens of this state do have a fundamental privacy interest in avoiding disclosure of "personal matters" under article 1, section 7. In my opinion, nondisclosure of personal information is an essential element of an individual's "private affairs", for without protection from compelled disclosure, the individual is dissuaded from sharing confidences and, in turn, from exercising his personal autonomy. Thus, I conclude that the right to avoid disclosure of personal matters, the essence of privacy, is necessarily protected by article 1, section 7. The fact that this interest may not be recognized under the federal constitution is not controlling. As we frequently have held, article 1, section 7 affords greater privacy protections to our citizens than does its federal counterpart. *See State v. White,* 97 Wn.2d 92, 640 P.2d 1061 (1982).

## IV

Assuming an individual has a fundamental interest under article 1, section 7 in avoiding disclosure of a "personal matter", the question remains as to what information this includes. One commentator has asserted that the privacy interest in nondisclosure should protect information "which a person desires to keep private and which, if disseminated, would tend to cause substantial concern, anxiety or embarrassment to a reasonable person." Leigh, *Informational Privacy: Constitutional Challenges to the Collection and Dissemination of Personal Information by Government Agencies,* 3 Hastings Const. L.Q. 229, 251 (1976). I agree. In my opinion, article 1, section 7 should protect such personal matters which, except for the challenged governmental action, could be kept confidential.

In this case, the respondents seek to avoid disclosure of mental health patients' names and diagnoses. This information clearly is of the type that a patient would desire to keep private. Indeed, there is substantial evidence that many patients would either forgo treatment entirely or divulge much less information than they otherwise would if such information was not collected and retained by the State. Furthermore, this information clearly is of the type which, if disseminated, would tend to cause a reasonable person substantial concern, anxiety, or embarrassment.[2] Finally, this information is of the type which, but for the CMHTS, could be kept in confidence by the mental health institution serving the patient. Accordingly, because I conclude that patients' names and diagnoses are "personal matter", article 1, section 7 should protect such information from compelled disclosure.

## V

The next task is determining the circumstances under which the right to nondisclosure protects such personal matter. As discussed above, mere collection of personal information can cause an individual severe psychological insecurity, regardless of whether the government intends to disseminate that information. As noted by one commentator, "[e]ven if totally effective safeguards are devised against abuses of information . . . many people will still feel their privacy is violated by any sort of probing of their inner lives." Bazelon, 12 Gonz. L. Rev. at 593. Therefore, I believe the right to avoid disclosure of personal information is implicated both by compelled disclosure of personal matter *to* the government, and nonconsensual dissemination of personal matter *by* the government. Accordingly, article 1,

---

[2]As stated by a commentator: "For many people medical records are the most sensitive form of personal information. If one questions the fact that the disclosure of personal medical information could affect one's entire future, recall what happened to the 1972 Democratic Party nominee for Vice President, Senator Thomas Eagelton, after it was disclosed that he had sought psychiatric help." Solomon, 7 W. New Eng. L. Rev. 753, 761 (1985).

section 7 should apply in either context.

In this case, we are concerned primarily with disclosure of personal information *to* the government. Thus, the fact that adequate safeguards exist to prevent the dissemination of the information *by* the government is of little consequence. In my opinion, article 1, section 7 should protect against compelled disclosure regardless of whether that information may, in fact, be disseminated to others. Security systems are not foolproof, and penal sanctions may not deter one seeking pecuniary gain. Accordingly, the best way to prevent government abuse is to preclude the government from collecting the information in the first place.

## VI

Because no privacy right can be absolute in this society, *In re R.*, 97 Wn.2d 182, 190, 641 P.2d 704 (1982), the final task is to determine the appropriate standard of review to apply to state action that infringes upon the right of non-disclosural privacy. In its cursory discussion of the state constitutional argument, the majority indicates that a state invasion of personal privacy will be upheld under article 1, section 7 if the State is attempting to effectuate "legitimate goals" by means which are "carefully tailored" to meet those goals. Majority opinion, at 937. I disagree. Although this rational basis test might be suitable for reviewing infringements upon lesser interests, where a fundamental privacy right is involved, I believe heightened scrutiny is necessary to curb governmental excesses.

In reviewing alleged infringements upon fundamental rights, this court generally determines whether the state action is justified by some "compelling state interest". *See State v. Koome*, 84 Wn.2d 901, 906, 530 P.2d 260 (1975). Nevertheless, because the ease of labeling certain governmental goals as "compelling state interests" might obviate the need for weighing the individual's privacy interest, I reject this analysis in favor of a balancing test. Thus, when reviewing an article 1, section 7 privacy challenge, I believe this court should assess the importance of the State's goals

and the individual's privacy interest to determine whether the State's interest outweighs that of the individual.[3] However, even if the State's interest does outweigh the individual's privacy interest, I believe the State should bear the burden of proving that it employed the least intrusive means available to effectuate its interest. *Accord,* A. Westin, at 370–77. *Cf. State v. Koome, supra* at 908 ("State restrictions on fundamental freedoms must be narrowly drawn to conform to the legitimate state interests to be furthered . . .").

In this case, the State asserts two interests which allegedly will be furthered by implementation of the CMHTS. First, the CMHTS will permit the State to maintain accurate accounting procedures, precluding duplication of service, and thereby ensuring continued federal funding. Second, the CMHTS will permit the State to "track" mental health patients once they have entered the mental health system, thereby ensuring continuity of service. Needless to say, these asserted State interests are legitimate.

The individual, on the other hand, has a significant privacy interest in avoiding both tracking and the disclosure of his name and diagnosis to the State. As stated earlier, mere collection of such information could create intense psychological insecurity, especially if the patient knew the information could be used to track him from one mental health center to the next. If the ability to maintain confidences and exercise personal autonomy means anything in this country, we must accord great weight to the patient's interest in nondisclosure.

---

[3]In reviewing a privacy challenge, however, the court should be mindful of Professor Westin's warning that

if all that has to be done to win legal and social approval for [an invasion of privacy] is to point to a social problem and show that [this invasion] would help to cope with it, then there is no balancing at all, but only a qualifying procedure for a license to invade privacy.

A. Westin, *Privacy and Freedom* 370 (1967). Thus, we must ask "whether the interest opposing privacy is sufficiently important to justify the invasion." Bazelon, *Probing Privacy,* 12 Gonz. L. Rev. 587, 601 (1977).

Although I ultimately conclude that, under the afore-mentioned balancing test, the State's asserted interests outweigh the individual's privacy interest, this conclusion is less obvious than the majority contends. First, with respect to the State's interest in ensuring continued federal funding, there is no evidence that use of the preexisting system had led or would lead to disallowance of federal funding. Thus, to the extent the State undertook unnecessary measures, its interests arguably are deserving of less weight. Nevertheless, because we live in a social welfare state, attendant with all of its valuable benefits, we can and must expect strict fiscal control from service–providing agencies. Thus, I conclude the State's interest in ensuring this control outweighs the individual's privacy interest in avoiding disclosure. To conclude otherwise would be to place an onerous burden on the agency responsible for efficient provision of necessary services.

The State also has a significant interest in maintaining continuity of service using a tracking system. Upon reflection, however, this aspect of CMHTS is most frightening. If today the government may track mental health patients, tomorrow it will track resident aliens, and the next day it might track you! If the government can justify the tracking of a particular group of people simply by pointing to a social ill and proposing a rational plan to cure it, we shall have abandoned one of the principle virtues of a democratic society—the right to be let alone. In short, I would be hard pressed to recognize many state interests that outweigh an individual's privacy interest in not being "tracked".

This interest, however, flows from an individual's right to exercise personal autonomy. Because some priority mental health patients might be unable to rationally exercise that autonomy due to their mental health (*i.e.,* be unable to decide whether they require treatment), the tracking system is justifiable on the ground it will ensure that all such individuals receive needed care from mental health professionals. In other words, without a tracking system mental health patients may be ensured personal autonomy, but at

the risk of forgoing necessary treatment. Because the tracking aspect of the CMHTS prevents patients from slipping through the cracks of our state's mental health system, I conclude the State's interest outweighs that of the individual.

## VII

As indicated previously, however, the inquiry does not end once this court determines that the State's interest is greater than the individual's. Under article 1, section 7, the State still bears the burden of proving that it employed the least intrusive means available to effectuate its interest.

The trial court found that the State's goals could be realized without requiring the mental health centers to disclose patient names and diagnoses to the Department of Social and Health Services. Clerk's Papers, at 23. This finding was based upon the extensive testimony of two University of Washington professors who testified that each mental health center could generate a unique patient code using computer "hashing" or encryption. The patient's name and diagnosis would remain with the health care provider, where this information would be protected within the confidential patient–therapist relationship. The code would be sent to the State for its legitimate purposes of accounting and tracking.

Despite the trial court's conclusion that this system would promote both the patient's confidentiality *and* the State's interests, the majority substitutes its judgment for the trier of fact, arguing that "such a system undoubtedly would be more *cumbersome* and *error prone* than having one centrally located encoding system." (Italics mine.) Majority opinion, at 936. With respect to the contention that the hashing system would be more "cumbersome", I do not believe constitutional protections can be denied to promote administrative expediency. Although one method of securing information may be less desirable to the State, where privacy interests are at stake, bureaucratic efficiency may have to be sacrificed. This is just such a case.

With respect to the majority's contention that the hashing system would be more "error prone", I direct the majority to the testimony of Professor Martin, who concluded that the probability of duplication was smaller than two–tenths of 1 percent, and the testimony of Professor Diehr, who concluded that the chance of duplication using a 10–character hash code was 1 in 1.78 million based upon a population of 60,000 persons. If it is human error that concerns the majority, I can only say that this is one of the vices of the human race. In my opinion, however, it is preferable to risk human error than to depend upon mechanistic perfection where the latter results in greater invasions of privacy.

The majority ignores substantial evidence in the record that establishes the availability of less intrusive means to effectuate the State's legitimate goals. Implicit in its opinion is the attitude that if technology can do it, and do it better, privacy interests are worthy of less protection. As recently noted by one commentator, however,

> [i]t is not technology, as such, which affects society for good or bad, but its uses, which are . . . shaped by the values of society and by the historical context in which the technology is used. . . . We must remember that we are not trapped helplessly in front of an unstoppable technological steamroller. Our control is in how we use our knowledge that we will be required to live with the results of our decisions on the use of this new technology.

Weingarten, *Privacy: A Terminal Idea,* 10 Hum. Rts. 18, 56, Fall 1982.

In this case, computer technology clearly promotes legitimate state interests, potentially for the good of society as a whole. Before this court rubber–stamps the use of this technology, however, it must contemplate the consequences of its application. Decisions which permit the government to collect and store personal information move this country that much closer to the Orwellian society we all fear. As rational decision makers, we have the ability to ensure that computer technology is used wisely. As the ultimate arbi-

ters of our state's constitution, we have the duty to protect the privacy rights of our state's citizens. In my opinion, the majority fails in both roles. Accordingly, because less intrusive means are available, I would affirm the trial court on the ground that the CMHTS is violative of article 1, section 7.

BRACHTENBACH, J., concurs with PEARSON, J.

Reconsideration denied July 10, 1986.