[No. 55358–1. En Banc. May 4, 1989.]

SHERYL BEDFORD, ET AL, *Respondents*, v. JULE SUGARMAN,
*as Secretary of the Department of Social and
Health Services*, ET AL, *Appellants*.

*Kenneth O. Eikenberry, Attorney General,* and *Janet Frickelton, Assistant,* for appellants.

*Deborah Perluss* and *Stan Taylor* of *Evergreen Legal Services,* for respondents.

DURHAM, J.—The present case, before this court on direct review from a judgment of the Thurston County Superior Court, tests the constitutionality of a state program providing in-kind food and shelter assistance to indigent alcoholics and drug addicts. The trial court held that the program infringes on the constitutional rights of its intended beneficiaries by requiring them to move into designated shelters in order to receive benefits. We reverse.

I

The shelter assistance program at issue here was established by a 1987 legislative enactment, the Alcoholism and Drug Addiction Treatment and Support Act (ADATSA). Laws of 1987, ch. 406 (codified at RCW 74.50). ADATSA effected a significant change in state assistance to indigent individuals who are unemployable as a result of alcoholism or drug addiction. Prior to the act's enactment, such individuals received cash grants for food and shelter under the General Assistance–Unemployable (GA–U) program.[1] Former RCW 74.04.005(6). ADATSA substituted for these cash benefits an in–kind "program of treatment and shelter". RCW 74.50.030; see Laws of 1987, ch. 406, § 9 (amending former RCW 74.04.005(6)).

The substitution of in–kind assistance for cash benefits was proposed by the Department of Social and Health Services (DSHS), with principally two justifications. First, the agency felt a shift to an in–kind benefits program would "remove any incentive for itinerant alcoholics to come to Washington State solely for the purpose of receiving cash grants." Second, the agency cited the need to prevent assistance recipients from using their grants to buy alcohol and drugs. DSHS Proposal for Restructuring Assistance to Alcoholics and Drug Addicts (Jan. 22, 1987), at 5. According to one DSHS official involved in the development of ADATSA, the elimination of cash benefits would

> correct an absurd situation which existed in the [GA–U] program. Under the [GA–U] program unemployed alcoholics and drug addicts were provided cash assistance from the state as long as they continued to drink and take drugs, but if they stopped drinking and abusing drugs, their cash assistance grants would be cut off. In essence, the state provided an incentive for persons to continue to drink and to abuse drugs, which in turn served as a disincentive to take the necessary steps to recover from the addiction. . . . The purpose of

---

[1]The GA–U program paid $314 per month at the time ADATSA replaced it.

ADATSA was first to remove the cash subsidy for persons leading alcoholic/drug addicted lifestyles and to provide alcohol and drug treatment for those persons who wanted to recover from alcoholism or drug addiction and were willing to commit themselves to the recovery process.

Declaration of Glen Miller, at 1–2. These purposes were made express in the ADATSA statute. *See* RCW 74.50-.010(2), (3).

As originally enacted, ADATSA called for the establishment of a "shelter assistance program to ensure the availability of shelter for persons eligible under this chapter." Laws of 1987, ch. 406, § 7. DSHS implemented this program by making available to beneficiaries "basic room and board services in a supervised and protected environment" at designated shelters operated under contract with the Department. Department of Social and Health Services, *ADATSA Implementation Plan* 4 (July 1987); *see also* WAC 388–40–100 (Supp. 1987).

In September 1987, respondents commenced this class–action suit[2] in Thurston County Superior Court, challenging DSHS's implementation of the ADATSA shelter assistance program as inconsistent with the ADATSA statute and violative of class members' constitutional rights of privacy, freedom of movement, and freedom of association. In November 1987 the trial court sustained the challenge on the statutory grounds alone, and issued a permanent injunction enjoining DSHS "from denying shelter assistance . . . which allows [beneficiaries] to remain in or acquire their own homes or other independent housing, and meet their basic living needs." In compliance with this injunction, DSHS modified its ADATSA implementation policy so that shelter assistance beneficiaries, instead of

---

[2]The class was later certified by the trial court to include "[a]ll past, present, and future applicants for and recipients of ADATSA shelter assistance under RCW 74.50.060, as amended, who presently reside in or are capable of maintaining their own residence, but whose shelter assistance is conditioned on living in group or dormitory type shelters."

being required to move into dormitory facilities, could receive cash assistance through a protective payee.

DSHS appealed the trial court's ruling to this court, but before the case could be heard, won vindication for its group shelter policy in the Legislature. In March 1988, the Legislature added to the ADATSA statute the following language:

"Shelter," "shelter support," or "shelter assistance" means a facility under contract to the department providing room and board in a supervised living arrangement, normally in a group or dormitory setting . . .

Laws of 1988, ch. 163, § 4 (amending RCW 74.50.060).

Three days after enactment of this amendatory language, DSHS ordered its administrators to "IMMEDIATELY CEASE OFFERING SHELTER ASSISTANCE IN INDEPENDENT HOUSING AS AN OPTION FOR NEW APPLICANTS . . . WHO WANT THE SHELTER TRACK."[3] In May 1988, respondents moved that DSHS be held in contempt for violating the November 1987 injunction. Respondents also asked the court to reaffirm that injunction on the constitutional grounds asserted in its original complaint.

During hearings on respondents' motions, the trial court noted that since the March 1988 amendment to the statute had removed the legal justification for the November injunction, the injunction could no longer be sustained in its original form. The court issued a new injunctive order, however, on the grounds that the ADATSA shelter program violates respondents' rights of privacy and association under both the United States and Washington Constitutions.[4] We granted DSHS's timely motion for direct review.

---

[3]Regulations to implement the legislative revisions took effect in June 1988. *See* State Register 88-13-110 (1988).

[4]This order enjoins DSHS from denying shelter assistance to eligible beneficiaries "who choose to remain in or acquire their own homes or other independent housing", and requires the agency to provide shelter assistance in a form "which will allow [beneficiaries] to reside in the housing of their choice."

## II

We first address two arguments advanced by DSHS challenging the trial court's injunctive order on procedural grounds. DSHS contends that the modification and reinstatement of the November 1987 injunction was improper because it was based on legal issues not raised in the initial proceedings. A second challenge contests respondents' standing to maintain the present action.

■ It is well established that a court may modify or vacate an injunction in light of changes in applicable law. *See* 11 C. Wright & A. Miller, *Federal Practice* § 2961, at 604–05, 609–10 (1973). Thus, the trial court acted properly in modifying the original injunction after the Legislature had amended the ADATSA statute. It was also proper for the court to address respondents' constitutional claims after the statutory grounds for the injunction had evaporated. Though the constitutional challenge to the 1988 legislative amendments obviously could not have been raised when this litigation began in 1987, DSHS is incorrect in characterizing this challenge as raising new legal issues. The 1988 amendments did little more than codify DSHS's policy for implementing the original ADATSA statute. By asserting against the 1988 amendments the same constitutional claims they raised in their earlier challenge to the implementation policy, respondents raise no new issues.

■ DSHS next asserts that respondents lack standing because only one of them, Barry Gearhart, lives in an ADATSA shelter, and he is there only as a temporary measure while awaiting federal supplemental security income benefits. The agency offers no convincing reason why residency in an ADATSA shelter should be a necessary precondition for standing to challenge the group shelter program, however. Any effect the requirement of group residency has on beneficiaries' rights is the same whether a beneficiary moves into a shelter or is denied aid for his refusal to do so. In either situation, the beneficiary has "the requisite 'personal stake in the outcome of the controversy' necessary to request an adjudication of the merits of this

case." *DeFunis v. Odegaard,* 82 Wn.2d 11, 24, 507 P.2d 1169 (quoting *Flast v. Cohen,* 392 U.S. 83, 99, 20 L. Ed. 2d 947, 88 S. Ct. 1942 (1968)), *appeal dismissed, cert. granted,* 414 U.S. 1038 (1973), *vacated as moot,* 416 U.S. 312 (1974).

That a beneficiary resides in a shelter only temporarily is also no impediment to his standing, or to that of the class. Aid recipients regularly will experience changes in their eligibilities and economic circumstances. The law of standing should accommodate these changes, lest important suits be ever evasive of adjudication. *See Conklin v. Shinpoch,* 107 Wn.2d 410, 414 n.1, 730 P.2d 643 (1986); *In re Patterson,* 90 Wn.2d 144, 149, 579 P.2d 1335 (1978).

### III

Our analysis of the constitutional validity of the ADATSA shelter program should properly first address the rights asserted by respondents under the Washington Constitution. *See State v. Coe,* 101 Wn.2d 364, 373–74, 679 P.2d 353 (1984). Respondents have alleged, and the trial court agreed, that the shelter program violates Const. art. 1, § 7, which provides: "No person shall be disturbed in his private affairs, or his home invaded, without authority of law."

In prior decisions, we have examined the scope of the protection article 1, section 7 affords against certain governmental searches and seizures. *See, e.g., State v. Stroud,* 106 Wn.2d 144, 720 P.2d 436 (1986); *State v. Gunwall,* 106 Wn.2d 54, 720 P.2d 808 (1986); *State v. Myrick,* 102 Wn.2d 506, 688 P.2d 151 (1984). We have not, however, previously undertaken a careful consideration of the extent to which this provision guarantees a more general right of privacy.[5] And we decline to do so now, in the absence of particularized briefing on this question. .

---

[5]The few decisions applying article 1, section 7 outside the search and seizure context have attributed to the provision no broader scope than federal constitutional privacy law. *See State v. Maxon,* 110 Wn.2d 564, 571, 756 P.2d 1297 (1988); *Peninsula Counseling Ctr. v. Rahm,* 105 Wn.2d 929, 936–37, 719 P.2d 926 (1986).

A threshold issue that is raised whenever a claim of right is made under the Washington Constitution is whether the asserted right should be held to be more broadly protected under the state constitution than it is under federal constitutional law. The issue is specific not just to the individual constitutional provision that is invoked, but also to the sort of right that is asserted. Thus, though a particular state constitutional provision might afford broader protection than federal law in some applications, it may not in others. *See State v. Reece,* 110 Wn.2d 766, 777–78, 757 P.2d 947 (1988).

In *Gunwall,* we articulated the sorts of inquiry that resolution of this threshold issue generally will require. They include close examination of the constitutional provision's text, history, and purpose, informed by a historical analysis of state policies and traditions concerning the asserted liberty. *See Gunwall,* at 61–63. Such analysis is essential, we noted, so that the process of state constitutional analysis may be "at once articulable, reasonable and reasoned." *Gunwall,* at 63.

Respondents have offered no arguments along the lines suggested in *Gunwall* to support their claim to protection from the ADATSA shelter requirements under article 1, section 7. Their contention that "[a]rt. 1, § 7 affords greater protection of privacy than does its federal counterpart", though correct in some circumstances, *see, e.g., Gunwall,* at 64–67, is not necessarily true with respect to the specific intrusions on privacy the shelter program allegedly effects.[6] A more searching examination of state constitutional and common law history, and of prior state law and policy regarding such rights, is necessary to determine if "well founded legal reasons" warrant resort to article 1, section 7 as "an independent source for recognizing and protecting" the rights respondents have asserted. *Gunwall,* at 62–63; *cf. State v. Reece, supra* at 775–81. Not having

---

[6]As discussed more fully below, respondents allege that the ADATSA program infringes rights of confidentiality and autonomy.

had the benefit of argument on these matters, we decline to apply Const. art. 1, § 7 in this case. *See State v. Jones,* 112 Wn.2d 488, 772 P.2d 496 (1989); *State v. Wethered,* 110 Wn.2d 466, 472, 755 P.2d 797 (1988); *State v. Worrell,* 111 Wn.2d 537, 539 n.1, 761 P.2d 56 (1988).

## IV

The extent to which the United States Constitution protects "privacy" is a question of considerable jurisprudential controversy. The basis for dispute lies both in the source of the right as well as in its proper scope. Privacy rights have been said by some to "emanate" from the "penumbras" of several constitutional provisions. *Griswold v. Connecticut,* 381 U.S. 479, 14 L. Ed. 2d 510, 85 S. Ct. 1678 (1965). Current interpretation, however, holds that "the 'right of privacy' is founded in the Fourteenth Amendment's concept of personal liberty". *Whalen v. Roe,* 429 U.S. 589, 598 n.23, 51 L. Ed. 2d 64, 97 S. Ct. 869 (1977); *see Carey v. Population Servs. Int'l,* 431 U.S. 678, 684, 52 L. Ed. 2d 675, 97 S. Ct. 2010 (1977).

Knowing where the right of privacy comes from affords only slight aid in determining where it leads. "Virtually every governmental action interferes with personal privacy to some degree." *Katz v. United States,* 389 U.S. 347, 350 n.5, 19 L. Ed. 2d 576, 88 S. Ct. 507 (1967). It would be all too easy, therefore, under the "vague precepts" of due process, *Snyder v. Massachusetts,* 291 U.S. 97, 114, 78 L. Ed. 674, 54 S. Ct. 330, 90 A.L.R. 575 (1934), to disapprove almost any governmental action as violative of the right of privacy.

The Constitution obviously cannot permit courts a power so boundless, else judges be found "roaming at large in the constitutional field", *Griswold,* at 502 (Harlan, J., concurring in the judgment), undoing the careful work of government. Especially in the area of social legislation, government must be given "broad latitude in experimenting with possible solutions to problems of vital local concern." *Whalen,* at 597; *see also Dandridge v. Williams,* 397

U.S. 471, 484, 25 L. Ed. 2d 491, 90 S. Ct. 1153 (1970). And so it is in this case that we entertain respondents' constitutional claims with a judicious balance of receptivity and restraint.[7]

### A

■ Decisional law expounding the constitutional right of privacy has identified two sorts of interests encompassed within the right.

One is the individual interest in avoiding disclosure of personal matters, and another is the interest in independence in making certain kinds of important decisions.

(Footnote omitted.) *Whalen,* at 599–600. Thus, the right of privacy is said to include rights of confidentiality and autonomy. *See Barry v. New York,* 712 F.2d 1554, 1558–59 (2d Cir.), *cert. denied,* 464 U.S. 1017 (1983); *Plante v. Gonzalez,* 575 F.2d 1119, 1128 (5th Cir. 1978), *cert. denied,* 439 U.S. 1129 (1979).

The Supreme Court first articulated the right of confidentiality in *Whalen v. Roe, supra.* Beyond its statement that a right of confidentiality exists, however, "*Whalen* provide[s] little guidance regarding the [right's] parameters . . ." *Borucki v. Ryan,* 827 F.2d 836, 842 (1st Cir. 1987). We must therefore look further to discover the nature and extent of this right.

Probably the largest category of cases in which a right of confidentiality has been recognized includes challenges to governmental demands for medical or psychiatric information about a person. *Whalen* appeared to find the right affected by a New York law requiring doctors to disclose to state authorities names and addresses of patients for whom

---

[7]Several recent cases considering privacy claims analogous to those asserted here have exhibited similar caution. *See Davis v. Bucher,* 853 F.2d 718 (9th Cir. 1988); *Caribbean Marine Servs. Co. v. Baldrige,* 844 F.2d 668, 676 (9th Cir. 1988); *Torres v. Wisconsin Dep't of Health & Social Servs.,* 838 F.2d 944, 951, *rev'd on other grounds,* 859 F.2d 1523 (7th Cir. 1988).

they had prescribed certain drugs.[8] Following *Whalen,* in *Peninsula Counseling Ctr. v. Rahm,* 105 Wn.2d 929, 719 P.2d 926 (1986), we found that DSHS regulations requiring state–subsidized mental health facilities to disclose patients' names and diagnoses to government auditors similarly impacted the right of confidentiality. *See also Gutierrez v. Lynch,* 826 F.2d 1534 (6th Cir. 1987) (medical information); *United States v. Westinghouse Elec. Corp.,* 638 F.2d 570 (3d Cir. 1980) (medical records); *Schachter v. Whalen,* 581 F.2d 35 (2d Cir. 1978) (medical records); *Doe v. DiGenova,* 642 F. Supp. 624 (D.D.C. 1986) (Veterans Administration records).

Extension of the right beyond the medical and psychiatric contexts began with *Nixon v. Administrator of Gen. Servs.,* 433 U.S. 425, 53 L. Ed. 2d 867, 97 S. Ct. 2777 (1977). A federal statute called for the establishment of an administrative process for determining which papers and tape recordings from Richard M. Nixon's presidency should be made available for public inspection, and which should be considered private and personal in nature and returned to Nixon. Though it upheld the statute as justified by legitimate governmental interests, the Court recognized the former President's confidentiality interest in the contents of his private documents.

We similarly recognized the existence of a constitutional confidentiality interest in nonmedical personal information in *Rhinehart v. Seattle Times Co.,* 98 Wn.2d 226, 654 P.2d 673 (1982), *aff'd,* 467 U.S. 20, 81 L. Ed. 2d 17, 104 S. Ct. 2199 (1984). During the discovery phase of a libel action, the trial court had issued an order compelling the plaintiffs to disclose certain personal information, including the

---

[8]Finding no evidence that the disclosed information would be released publicly, however, the Court concluded that no confidentiality interest was affected. *Whalen v. Roe,* 429 U.S. 589, 600–02, 51 L. Ed. 2d 64, 97 S. Ct. 869 (1977). Thus, it is arguable that *Whalen* did not identify a constitutional confidentiality interest in the prescription information. *See Whalen,* at 607–09 (Stewart, J., concurring); *Peninsula Counseling Ctr. v. Rahm,* 105 Wn.2d 929, 941–42, 719 P.2d 926 (1986) (Pearson, J., dissenting); *Davis v. Bucher,* 853 F.2d 718, 720 n.3 (9th Cir. 1988).

names of members and benefactors of plaintiffs' religious group. Though we upheld the trial court's discovery order as "necessary to enable the courts to render a just decision upon the relevant facts", we acknowledged that the order would have an impact on plaintiffs' privacy. *Rhinehart,* at 257. Plaintiffs' interest in nondisclosure was recognized also as partial justification for a protective order prohibiting the defendant newspapers from publishing information obtained under the discovery order. *Rhinehart,* at 253–54, 256–57; *see also Seattle Times Co. v. Rhinehart,* 467 U.S. 20, 35, 81 L. Ed. 2d 17, 104 S. Ct. 2199 (1984); 467 U.S. at 38 (Brennan, J., concurring).

Other cases have recognized confidentiality interests in corporate "trade secrets and related commercial information", *Tavoulareas v. Washington Post Co.,* 724 F.2d 1010, 1023 (D.C. Cir. 1984); personal financial data, *Barry v. New York, supra* at 1561, *Plante v. Gonzalez, supra* at 1132; "information regarding personal sexual matters", *Thorne v. El Segundo,* 726 F.2d 459, 468 (9th Cir. 1983); and other "intimate information", *Fadjo v. Coon,* 633 F.2d 1172, 1176 (5th Cir. 1981), *Slayton v. Willingham,* 726 F.2d 631, 635 (10th Cir. 1984). A somewhat more tentative case law ascribes constitutional significance to the individual's interest in avoiding disclosure of his naked body. *See York v. Story,* 324 F.2d 450 (9th Cir. 1963), *cert. denied,* 376 U.S. 939 (1964); *Local 567, Am. Fed'n of State, Cy. & Mun. Employees v. Michigan Coun. 25, Am. Fed'n of State, Cy. & Mun. Employees,* 635 F. Supp. 1010 (E.D. Mich. 1986); *Backus v. Baptist Med. Ctr.,* 510 F. Supp. 1191 (E.D. Ark. 1981), *vacated as moot,* 671 F.2d 1100 (8th Cir. 1982), and cases therein cited. *But see Davis v. Bucher,* 853 F.2d 718 (9th Cir. 1988); *Griffin v. Michigan Dep't of Corrections,* 654 F. Supp. 690, 703 (E.D. Mich. 1982).

▮ From these cases, it appears that the right of confidentiality the Supreme Court first articulated in *Whalen v. Roe, supra,* in its broadest application, protects against disclosure only of certain particularized data, information or photographs describing or representing intimate facts

about a person. The case law does not support the existence of "a general right to nondisclosure of private information." *J.P. v. DeSanti,* 653 F.2d 1080, 1090 (6th Cir. 1981) (right does not afford protection against governmental disclosure of juvenile court records).

On this understanding of the nature and scope of the confidentiality branch of the right of privacy, we are unable to find constitutional fault in the ADATSA shelter program. There is no evidence that shelter residents must disclose intimate personal information to obtain shelter benefits. While residents share many shelter facilities,[9] and thus must undertake many daily life activities in view of one another, we do not believe this results in invasions of constitutionally protected privacy interests. "Exposure of the self to others in varying degrees is a concomitant of life in a civilized community." *Time, Inc. v. Hill,* 385 U.S. 374, 388, 17 L. Ed. 2d 456, 87 S. Ct. 534 (1967). With respect to those aspects of personality, appearance and behavior that ordinarily would be exposed in public, therefore, respondents have no legitimate claim to privacy. *See, e.g., Nixon v. Administrator of Gen. Servs., supra* at 459; *Katz v. United States,* 389 U.S. 347, 351, 19 L. Ed. 2d 576, 88 S. Ct. 507 (1967); *United States v. Dionisio,* 410 U.S. 1, 35 L. Ed. 2d 67, 93 S. Ct. 764 (1973); *United States v. Mara,* 410 U.S. 19, 35 L. Ed. 2d 99, 93 S. Ct. 774 (1973).

Beyond what is already public—visage, voice, mannerisms, etc.—we cannot discern what it is that respondents feel the group shelter unreasonably requires them to reveal. The record respondents have compiled establishes only that shelter residents share living facilities. Nothing about how these facilities are organized suggests that residents suffer a degrading or embarrassing invasion of intimate aspects of their person. Compare *Forts v. Ward,* 471 F. Supp. 1095

---

[9]ADATSA shelter residents share sleeping quarters, bathrooms and dining areas. In some facilities, two or three residents share a room. Two of the larger facilities in Seattle have 50 to 60 beds in a dormitory setup, in one case with partitions separating the beds, in another with no partitioning.

(S.D.N.Y. 1978), *vacated on other grounds,* 621 F.2d 1210 (2d Cir. 1980). Respondents cite no case, moreover, and we have discovered none, holding that mere cohabitation or coexistence interferes with personal privacy rights.[10] Indeed, such a notion would imperil the efficient operation of any number of public programs in the areas of health care, housing, corrections, education and the military. *Cf. Barrows v. State,* 106 Idaho 901, 684 P.2d 303 (rebuffing constitutional challenge to group living arrangements at state hospital), *cert. denied,* 469 U.S. 1074 (1984). In the absence of relevant authority, we decline to expand the privacy right in this manner. *Cf. J.P. v. DeSanti, supra* at 1088–91.

B

■ The autonomy that is protected by the constitutional right of privacy generally has been conceived as circumscribed by the Supreme Court's fundamental rights jurisprudence. As the Court explained in *Whalen v. Roe, supra* for example, the right encompasses decisions "dealing with 'matters relating to marriage, procreation, contraception, family relationships, and child rearing and education . . .'" *Whalen v. Roe,* 429 U.S. 589, 600 n.26, 51 L. Ed. 2d 64, 97 S. Ct. 869 (1977) (quoting *Paul v. Davis,* 424 U.S. 693, 713, 47 L. Ed. 2d 405, 96 S. Ct. 1155 (1976)); *see also Plante v. Gonzalez, supra* at 1128–32. The

---

[10]*Robbins v. Superior Court,* 38 Cal. 3d 199, 695 P.2d 695, 211 Cal. Rptr. 398 (1985), on which the trial court substantially relied, is inapposite because it was decided as a matter of state, not federal, constitutional law. The *Robbins* court's conclusion that "an acute loss of personal privacy is inevitable where residents sleep in dormitories, eat in a cafeteria, use the same bathrooms, and live according to institutionally prescribed rules of conduct", *Robbins,* at 213, describes only the effect of a group shelter program on the broad privacy right guaranteed by Cal. Const. art. 1, § 1. The California constitutional right of privacy is significantly broader than the right of privacy protected by the federal constitution. *Compare, e.g., Santa Barbara v. Adamson,* 27 Cal. 3d 123, 130, 610 P.2d 436, 164 Cal. Rptr. 539, 12 A.L.R.4th 219 (1980) (California privacy right protects individual's choice of household companions, including those "not related by blood, marriage, or adoption") *with Moore v. East Cleveland,* 431 U.S. 494, 498–500, 52 L. Ed. 2d 531, 97 S. Ct. 1932 (1977) (federal privacy right protects only cohabitation by related individuals).

ADATSA shelter program intrudes on shelter residents'
rights of autonomy, therefore, only if it affects residents'
ability to make these sorts of crucial decisions.[11]

Respondents do not contend that the ADATSA shelter
program affects their marriages, family lives, or any of the
activities that are considered so fundamental to personal
liberty as to fall within the constitution's substantive pro-
tections. Indeed, respondents have not even established
that any member of the class of plaintiffs in this litigation
is married or has a family. Rather, respondents assert, and
the trial court agreed, that the shelter program violates
their constitutional autonomy rights by denying them the
ability freely to choose their household companions.

In support of this contention, respondents and the trial
court rely principally on two cases:[12] *Myrick v. Board of
Pierce Cy. Comm'rs,* 102 Wn.2d 698, 677 P.2d 140, 687 P.2d
1152 (1984), and *Voris v. Human Rights Comm'n,* 41 Wn.
App. 283, 704 P.2d 632, *review denied,* 104 Wn.2d 1018
(1985). Neither decision supports respondents' theory,
however. *Myrick* struck down as violative of constitutional
privacy rights a county ordinance requiring massage parlors
to fit their internal doors with 2–way viewing portals. The
privacy interest the ordinance infringed was not that of
autonomy, but that of confidentiality. *See Myrick,* at 704
(privacy affected because ordinance required "public view
of a massage"). As we have previously discussed, respon-
dents have not established that as residents of ADATSA
shelters they are required to expose their bodies publicly so

---

[11]This case does not present any question concerning the extent to which an
individual's decision to refuse life–sustaining medical treatment is constitutionally
protected. Compare *In re Colyer,* 99 Wn.2d 114, 660 P.2d 738 (1983); *In re
Ingram,* 102 Wn.2d 827, 689 P.2d 1363 (1984); *In re Grant,* 109 Wn.2d 545, 747
P.2d 445 (1987).

[12]Additionally, reliance is placed on *Robbins v. Superior Court,* 38 Cal. 3d
199, 695 P.2d 695, 211 Cal. Rptr. 398 (1985). As discussed above, *Robbins* is
improper authority for resolution of the federal constitutional questions pre-
sented.

as to implicate the sort of privacy interest that we recognized in *Myrick*.

*Voris* involved an appeal from an order of the Human Rights Commission fining a landlord for refusing to rent a room to a prospective tenant on racial grounds. The landlord asserted her right "to choose the people with whom she will share her home" as a defense. *Voris,* at 290. The Court of Appeals, upholding the finding of illegal discrimination, did not agree that the landlord possessed the right she claimed, but only assumed the existence of that right before finding it countervailed by compelling state interests.

Direct refutation of the right respondents assert is provided by the decisions of the United States Supreme Court in *Belle Terre v. Boraas,* 416 U.S. 1, 39 L. Ed. 2d 797, 94 S. Ct. 1536 (1974) and *Moore v. East Cleveland,* 431 U.S. 494, 52 L. Ed. 2d 531, 97 S. Ct. 1932 (1977). In *Belle Terre,* the Court upheld against a constitutional privacy challenge a town ordinance prohibiting group living by individuals not of the same family. In *Moore,* however, the Court struck down another occupancy ordinance that prohibited certain family members from cohabiting. The distinction between the two ordinances, as the Court clearly stated in *Moore,* was that the latter affected cohabitation of family members, while the former "affected only *unrelated* individuals." *Moore,* at 498. As delineated by *Moore* and *Belle Terre,* therefore, the constitutional right of privacy protects cohabitation choices only when they involve family members. The constitution does not afford general protection to an individual's choice of household companions.

Even assuming some individuals who are eligible for ADATSA shelter benefits are married or have families, we still would not find the group shelter program unconstitutional as applied to them. ADATSA does not prohibit such individuals from choosing to live with their families. Any restraints they may feel on their freedom to make this choice are of a financial, not governmental, nature, and thus are not a constitutional concern. *Cf. Harris v. McRae,* 448 U.S. 297, 316–17, 65 L. Ed. 2d 784, 100 S. Ct. 2671

(1980). While the constitution respects the realm of the family, it does not guarantee family unity at state expense. *See Black v. Beame,* 550 F.2d 815 (2d Cir. 1977); *Child v. Beame,* 412 F. Supp. 593 (S.D.N.Y. 1976); *King v. McMahon,* 186 Cal. App. 3d 648, 230 Cal. Rptr. 911 (1986).

## C

Our analysis of respondents' contention that the ADATSA shelter program infringes on their constitutionally protected freedom of association concludes similarly to our examination of their arguments based on the constitutional right of privacy. We find no authority in precedent or logic indicating that the freedom of association is implicated here.

 Like the right of privacy, the right of free association is an implied right under the constitution. Principally, this right has been conceived as protecting associations entered into for purposes of engaging in activities protected under the First Amendment. *See, e.g., NAACP v. Alabama ex rel. Patterson,* 357 U.S. 449, 2 L. Ed. 2d 1488, 78 S. Ct. 1163 (1958). Recently, however, the Supreme Court has suggested that the right protects not only such "freedom of expressive association", but also a "freedom of intimate association". *See New York State Club Ass'n v. New York,* ___ U.S. ___, 101 L. Ed. 2d 1, 15–16, 108 S. Ct. 2225, 2233–34 (1988); *Board of Directors of Rotary Int'l v. Rotary Club,* 481 U.S. 537, 95 L. Ed. 2d 474, 484, 107 S. Ct. 1940, 1946 (1987); *Roberts v. United States Jaycees,* 468 U.S. 609, 617–18, 82 L. Ed. 2d 462, 104 S. Ct. 3244 (1984). Respondents rely only on the second of these freedoms in challenging the ADATSA shelter program.

The Supreme Court provided its fullest exposition of the freedom of intimate association in *Roberts v. United States Jaycees, supra.* While declining to "identify[] every consideration that may underlie this type of constitutional protection," the Court noted that the protection likely extends to those "personal bonds [that] have played a critical role in the culture and traditions of the Nation by cultivating

and transmitting shared ideals and beliefs . . ." Family associations, the Court said, "suggest some relevant limitations on the relationships that might be entitled to this sort of constitutional protection . . ." *Roberts,* at 618–19.

From this description, it appears that "the freedom of intimate association is coextensive with the right of privacy". *Fleisher v. Signal Hill,* 829 F.2d 1491, 1500 (9th Cir. 1987). Both rights, as the Supreme Court has articulated and applied them, extend only so far as the principles of substantive due process permit. Having concluded that the ADATSA shelter program does not infringe on respondents' privacy rights, therefore, we find that the program also does not deny them their constitutional right to determine their intimate associations.

V

█ We hold that the ADATSA shelter program, as established by the Legislature and currently operated by DSHS, does not violate the constitutional privacy or associational rights of eligible beneficiaries. Accordingly, we remand the case with instructions that the injunction entered by the trial court be vacated.

CALLOW, C.J., and DOLLIVER, DORE, ANDERSEN, and SMITH, JJ., concur.

UTTER, J. (concurring)—I concur with the majority's result but write specially to emphasize the context in which today's decision is made. The language of the majority's ultimate holding—that the ADATSA program does not violate the participants' privacy rights because it does not cause them to "suffer a degrading or embarrassing invasion of intimate aspects of their person"—is proper in this case. See majority, at 512. It does not, however, represent a broad rule characterizing the ambit of the right to privacy generally. If it did, such a rule would go a good deal beyond the cases upon which the majority relies for authority. Rather, the holding in today's case, as the signers of the

majority would agree, is limited to the specific context from which it arises.

The cases cited by the majority reflect the principle that jurisprudence concerning the right to privacy is intimately tied to the circumstances surrounding each case. The United States Supreme Court in *Nixon v. Administrator of Gen. Servs.*, 433 U.S. 425, 465, 53 L. Ed. 2d 867, 97 S. Ct. 2777 (1977), stated:

> [T]he constitutionality of the [Presidential Recordings and Materials Preservation] Act must be viewed in the context of the limited intrusion of the screening process, of appellant's status as a public figure, of his lack of any expectation of privacy in the overwhelming majority of the materials, of the important public interest in preservation of the materials, and of the virtual impossibility of segregating the small quantity of private materials without comprehensive screening. . . .

The Court put in plain terms that "the merit of appellant's claim of invasion of his privacy cannot be considered in the abstract". 433 U.S. at 458. Likewise, our holding is not an abstraction of the law of the right to privacy; it is carefully tailored to the situation presented.

Today's case involves a program offered by the State to indigent people impaired by alcoholism or drug addiction. The State's action here does not amount to a direct intrusion, coercive or otherwise, into the lives of its citizens. Rather, it is an offer to provide food and shelter to those who might otherwise be unable to obtain it. In an institutional residential setting entered into voluntarily, a program participant's expectation of privacy will generally be less than in other forms of residence. While the respondents argue that the program denies them the freedom to choose with whom they are to live, they in fact have made a choice: to live in the institutional environment provided by the ADATSA program.

While government need not subsidize the exercise of a constitutional right, *see Harris v. McRae,* 448 U.S. 297, 65 L. Ed. 2d 784, 100 S. Ct. 2671 (1980), it also cannot condition the receipt of benefits on the waiver of such rights. *See*

*Sherbert v. Verner,* 374 U.S. 398, 10 L. Ed. 2d 965, 83 S. Ct. 1790 (1963); *FCC v. League of Women Voters,* 468 U.S. 364, 82 L. Ed. 2d 278, 104 S. Ct. 3106 (1984); *see also* L. Tribe, *American Constitutional Law* § 11–5 (2d ed. 1988). Therefore, even though the respondents lived in the residential center voluntarily and thus experienced a lessened expectation of privacy, they cannot be compelled to forsake their right to privacy completely. The majority has identified the point at which, in this setting, the respondents' rights would be violated. The ADATSA program does not cross this point; thus there is no violation. Nothing more than this is decided.

Because this case involves solely the interest in and expectation of privacy in a residential program entered into voluntarily, citation to cases such as *Belle Terre v. Boraas,* 416 U.S. 1, 39 L. Ed. 2d 797, 94 S. Ct. 1536 (1974), is unnecessary. To use such cases in contexts other than the ones from which they arose confuses the development of the law of privacy. A close inspection of *Belle Terre* and of *Moore v. East Cleveland,* 431 U.S. 494, 52 L. Ed. 2d 531, 97 S. Ct. 1932 (1977), shows that the rules from those cases are confined to the context of zoning law. To apply them to the present case—taking them out of the areas of law in which they were crafted—is to strip them of their limiting principles.

In light of the above concerns, I concur with the majority's opinion insofar as it is limited to the facts of this case.

BRACHTENBACH and PEARSON, JJ., concur with UTTER, J.

Reconsideration denied June 26, 1989.