# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| SERVICE EMPLOYEES INTERNATIONAL UNION LOCAL 925, a labor organization, | No. 48522-2-II |
| Appellant and Cross-Respondent, | |
| v. | |
| FREEDOM FOUNDATION, | PUBLISHED OPINION |
| Respondent and Cross-Appellant, | |
| STATE OF WASHINGTON, DEPARTMENT OF SOCIAL AND HEALTH SERVICES, | |
| Respondent. | |

JOHANSON, J. — The Freedom Foundation (Foundation) submitted a Public Records Act (PRA)[1] request to the Department of Social and Health Services (DSHS). The Foundation requested disclosure of the names of childcare providers in Washington's "Family Friends and Neighbors" (FFN) program and their "state contact" information. The Foundation's expressed purpose in requesting the records was to correspond with the individual providers and to notify them of their constitutional right to refrain from union membership and fee payments. DSHS was ready to disclose the requested information. But Service Employees International Union Local

---

[1] Ch. 42.56 RCW.

925 (SEIU 925), the labor union representing the providers, obtained a temporary restraining order (TRO) and filed a complaint for injunctive relief to enjoin DSHS from disclosing this information. The superior court denied injunctive relief. SEIU 925 appeals.[2]

We hold that (1) RCW 42.56.070(9) does not preclude DSHS from disclosing the FFN provider information because the Foundation did not request the information for commercial purposes, (2) RCW 42.56.230(2)(a)(ii) does not preclude DSHS from disclosing the FFN provider information because the Foundation's request does not seek children's personal information, and (3) the Washington constitution does not preclude DSHS from disclosing the FFN provider information because the requested information does not intrude into the private affairs of the FFN providers. The superior court properly denied permanent injunctive relief because neither the language nor the spirit of the PRA or the Washington constitution preclude DSHS from releasing the requested FFN provider information. We affirm the superior court.

FACTS

I. THE PARTIES

FFN providers are license-exempt family, friends, and neighbors who provide state-subsidized childcare. Most FFN providers care for the child in the child's home, some providers are relatives of the child they care for, and some share the same address as the child. Working Connections Child Care (WCCC) is the State's largest childcare subsidy program. SEIU 925 is the FFN providers' collective bargaining representative and the signatory to the contract with the

---

[2] The Foundation cross appeals, arguing that the superior court erred by ruling that SEIU 925 has associational standing to challenge the disclosure of the requested FFN provider information and granting SEIU 925's motion for a TRO. Because we affirm the superior court on other grounds, we do not address these issues.

State that determines the manner and rate with which the WCCC makes subsidy payments to the FFN providers.

The Foundation is a nonprofit based in Washington working to "expose, defund, and discredit" unions. Clerk's Papers (CP) at 103. One of the Foundation's purposes is to educate public employees about their rights to withdraw their membership in and payment of fees to public sector unions. The Foundation has contacted SEIU 925 members and directed them to a website explaining how providers can "opt out" of union membership, but that site does not contain a link to the Foundation's website or links to contribute to the Foundation. In fundraising letters, e-mails, and ads from 2014 to 2016, the Foundation speaks to its mission to bankrupt and dismantle unions, including SEIU 925. Some of the fundraising letters specifically mention using lists of SEIU 925 members to visit or contact them to let them know they can opt out of union membership.

## II. THE FOUNDATION'S PRA REQUEST

In October 2014, the Foundation submitted a PRA request to DSHS that requested a list of all FFN and/or license-exempt childcare providers who received funds, payments, or reimbursements within the last year from DSHS through the WCCC program and a list of such providers for whom DSHS has withheld payments to SEIU 925 in the last year. The request sought "the full name of the primary contact, any relevant firm or enterprise name, the mailing address used for state business, email address used for state contact, and the telephone number used for state contact." CP at 57. The request affirmed it would not be used for commercial purposes. In November, DSHS notified SEIU 925 of the Foundation's PRA request and that DSHS would release the records absent a court order issued by December 10.

### III. COMPLAINT AND TRO

In December, SEIU 925 filed a complaint for declaratory and injunctive relief against DSHS and the Foundation requesting a permanent injunction under RCW 42.56.540 prohibiting DSHS from releasing the FFN provider information. SEIU 925 also filed a motion for a TRO to prevent the immediate release of the information.

SEIU 925 argued that the TRO was necessary because release of the FFN providers' information was prohibited under RCW 42.56.070(9)'s "commercial purposes" provision and would violate RCW 42.56.230(2)(a)(ii), a provision that exempts personal information of children from disclosure. SEIU 925 also argued that the requested information was exempt from disclosure because the release of the information posed an unreasonable invasion of personal privacy prohibited by the state constitution.[3] Following argument, the superior court granted SEIU 925's TRO motion, which enjoined DSHS from releasing FFN providers' information until the matter could be reviewed on January 9, 2015.

### IV. INJUNCTION HEARING AND APPEAL

On January 9, 2015, the superior court held a permanent injunction hearing. SEIU 925 reiterated its TRO arguments.

The Foundation stated that its intent behind the PRA request was to inform childcare providers of their constitutional right to choose whether they wanted to financially support a union. The Foundation noted that the superior court already rejected a similar commercial purposes

---

[3] SEIU 925 also argued that the information requested was exempt from disclosure under the state constitutional protections of right of free association. However, the parties stipulated that the disclosure would not implicate free association rights.

argument in its October 22, 2014 decision in *SEIU Healthcare 775NW v. Department of Social & Health Services*, cause no. 14-2-01903-1 (Thurston County Superior Court), and that any factual differences that SEIU 925 may assert between the cases had no legal significance.

In its ruling, the superior court stated that many of the issues raised had previously been decided in *SEIU Healthcare 775NW* and in *SEIU Local 925 v. Department of Early Learning*, cause no. 14-2-02082-9 (Thurston County Superior Court). The trial court ruled that the Foundation's PRA request was not for a commercial purpose and that the disclosure of children's personal information exemption under RCW 42.56.230(2)(a)(ii) did not apply. Further, the superior court rejected SEIU 925's constitutional privacy argument.

The superior court denied SEIU 925's request for injunctive relief. But the superior court extended the TRO for 20 days to allow SEIU 925 to appeal its ruling. SEIU 925 appealed the superior court's order denying injunctive relief to this court.

ANALYSIS

I. PRA STANDARD OF REVIEW AND RULES OF LAW

A. THE PRA

We review challenges to an agency action under the PRA de novo. RCW 42.56.550(3); *Resident Action Council v. Seattle Hous. Auth.*, 177 Wn.2d 417, 428, 327 P.3d 600 (2013). "Where the record consists only of affidavits, memoranda of law, and other documentary evidence, an appellate court stands in the same position as the trial court in reviewing agency action challenged under the PRA." *Robbins Geller Rudman & Dowd LLP v. Office of Att'y Gen.*, 179 Wn. App. 711, 719-20, 328 P.3d 905 (2014).

The PRA mandates the broad disclosure of public records. *Resident Action Council*, 177 Wn.2d at 431. Under RCW 42.56.070(1), a government agency must disclose public records upon request unless the records fall within the specific exemptions of RCW 42.56.070(9), the PRA, or other statute that exempts or prohibits disclosure of specific information or records. *Ameriquest Mortg. Co. v. Office of Att'y Gen.*, 177 Wn.2d 467, 485-86, 300 P.3d 799 (2013) (*Ameriquest* II). The party seeking to prevent disclosure bears the burden of establishing that an exemption applies. RCW 42.56.550(1); *Ameriquest* II, 177 Wn.2d at 486.

RCW 42.56.030 expressly requires the PRA be "liberally construed and its exemptions narrowly construed . . . to assure that the public interest will be fully protected." As a result, we must liberally construe the PRA in favor of disclosure. *West v. Port of Olympia*, 183 Wn. App. 306, 311, 333 P.3d 488 (2014). When evaluating a PRA claim, we must also "take into account the policy . . . that free and open examination of public records is in the public interest, even though such examination may cause inconvenience or embarrassment to public officials or others." RCW 42.56.550(3).

### B. PERMANENT INJUNCTIONS UNDER THE PRA

We review a trial court's decision to grant or deny a permanent injunction in relation to the PRA de novo. *Robbins Geller*, 179 Wn. App. at 719. A party other than a government agency seeking to prevent the disclosure of public records under the PRA may seek an injunction under RCW 42.56.540. *Ameriquest* II, 177 Wn.2d at 487. RCW 42.56.540 provides,

> The examination of any specific public record may be enjoined if, upon motion and affidavit by an agency or its representative or a person who is named in the record or to whom the record specifically pertains, the superior court . . . finds that such examination would clearly not be in the public interest and would substantially and irreparably damage any person, or would substantially and irreparably damage vital government functions.

6

Under this statute, the moving party must prove that (1) the record in question specifically pertains to that party, (2) an exemption applies, and (3) the disclosure would not be in the public interest and would substantially and irreparably harm that party or a vital government function. *Ameriquest* II, 177 Wn.2d at 487.

In applying RCW 42.56.540, the trial court first determines whether a PRA exemption applies. *See Bainbridge Island Police Guild v. City of Puyallup*, 172 Wn.2d 398, 408, 259 P.3d 190 (2011). Only if an exemption applies does the trial court address whether an injunction is appropriate under the statutory requirements: whether disclosure would not be in the public interest and would substantially and irreparably damage a person or vital government functions. *Bainbridge Island*, 172 Wn.2d at 408, 420.

## II. EXEMPTIONS TO PRA DISCLOSURE WARRANTING AN INJUNCTION

### A. COMMERCIAL PURPOSES EXEMPTION – RCW 42.56.070(9)

SEIU 925 argues that RCW 42.56.070(9) prohibits DSHS from releasing the FFN provider information because the Foundation requested the information for commercial purposes, and thus SEIU 925 should have been awarded a permanent injunction. The Foundation's stated purpose in requesting the lists was to attempt to correspond with the individual providers and notify them of their constitutional right to refrain from union membership and fee payments. Our decision in *SEIU Healthcare 775NW v. Department of Social & Health Services*, 193 Wn. App. 377, 400-09, 377 P.3d 214, *review denied*, 186 Wn.2d 1016 (2016), controls here. We hold that the Foundation's purpose for requesting the information is not a commercial purpose because the Foundation does not intend to generate revenue or financial benefit from the direct use of the

information. Therefore, RCW 42.56.070(9) does not preclude DSHS from disclosing the requested FFN provider information.

1.    STATUTORY LANGUAGE

RCW 42.56.070(9) states,

> This chapter shall not be construed as giving authority to any agency . . . to give, sell or provide access to lists of individuals requested for commercial purposes, and agencies . . . shall not do so unless specifically authorized or directed by law.

This language clearly focuses on the requester's reason for seeking disclosure. The requesting party must seek the release of information for "commercial purposes." RCW 42.56.070(9).

2.    *SEIU HEALTHCARE 775NW* INTERPRETATION OF RCW 42.56.070(9)

The PRA does not define "commercial purposes," but this court in *SEIU Healthcare 775NW* defined the scope and meaning of the commercial purpose prohibition. 193 Wn. App. at 400-03.

In *SEIU Healthcare 775NW*, we stated that RCW 42.56.070(9) must be construed in favor of disclosure consistent with the PRA's strong mandate for broad disclosure of public records. 193 Wn. App. at 400. We then considered dictionary definitions and several attorney general opinions to determine that "commercial purposes" include business activities by any form of business enterprise—including nonprofits—intended to generate revenue or financial benefit. *SEIU Healthcare 775NW*, 193 Wn. App. at 400-03. Thus, we held that "commercial purpose" is defined as the intent to generate revenue or financial benefit from the direct use of the information. *SEIU Healthcare 775NW*, 193 Wn. App. at 403, 406.

3.    APPLICATION OF *SEIU HEALTHCARE 775NW*

SEIU 925 argues that the Foundation has a commercial purpose here because one of the Foundation's central fundraising strategies is publicizing the Foundation's acquisition of and use of provider information to support its mission of dismantling unions.[4]   SEIU 925 then provides several examples of the Foundation fundraising materials that publicize the acquisition and use of provider information.   SEIU 925 also argues that the Foundation's request has a commercial purpose because when the Foundation uses the list to contact FFN providers, that effort is a "vehicle to future mailings and solicitations" to providers.  Suppl. Br. of Appellant at 8.   SEIU 925's arguments are the same as those we rejected in *SEIU Healthcare 775NW* and SEIU 925 fails to distinguish *SEIU Healthcare 775NW* from this case.

In *SEIU Healthcare 775NW*, the union sought an injunction preventing DSHS from releasing lists of individual home care providers pursuant to a PRA request from the Foundation. 193 Wn. App. at 384.   The Foundation's stated purpose for the request was to enable it to correspond with the providers and to notify them of their constitutional right to refrain from union membership and fee payments. *SEIU Healthcare 775NW*, 193 Wn. App. at 384. SEIU Healthcare 775NW argued that the injunction was warranted because RCW 42.56.070(9) prohibited the disclosure. *SEIU Healthcare 775NW*, 193 Wn. App. at 384. SEIU Healthcare 775NW argued that the commercial purposes exemption applied for several reasons, including because the Foundation

---

[4] SEIU 925 concedes that, as in *SEIU Healthcare 775NW*, the Foundation's intended use of contacting SEIU 925 members to encourage them to cease union support is noncommercial.  In *SEIU Healthcare 775NW*, we concluded that notifying individuals of their constitutional rights does not directly involve the generation of revenue or financial benefit and was more of a political purpose than a commercial one.  193 Wn. App. at 408.  Thus, we accept SEIU 925's concession on this point.

would benefit from direct use of the provider list since contacting SEIU Healthcare 775NW providers would increase the Foundation's membership and funds and would bring "'credit and attention to [the Foundation's] own extreme political views.'" *SEIU Healthcare 775NW*, 193 Wn. App. at 404.

We held that the information sought in the Foundation's request was not exempt from disclosure under the commercial purpose exemption, RCW 42. 56.070(9), and thus concluded that the trial court properly denied an injunction on the basis of that exemption. *SEIU Healthcare 775NW*, 193 Wn. App. at 408. In so holding, we noted that SEIU Healthcare 775NW failed to show that the Foundation was soliciting providers or how obtaining the lists and contacting providers raised money or membership for the Foundation. *SEIU Healthcare 775NW*, 193 Wn. App. at 408. Thus, we concluded that any benefit from fundraising by "broadly publicizing its goal to defund SEIU" was "too attenuated [of a benefit] to constitute a commercial purpose." *SEIU Healthcare 775NW*, 193 Wn. App. at 407. And finally, we concluded that even if informing the providers of the Foundation's political views caused individual providers to join the Foundation or donate, this benefit was also too attenuated to constitute a commercial purpose. *SEIU Healthcare 775NW*, 193 Wn. App. at 408.

Here, SEIU 925 is correct that in the Foundation's fundraising letters, e-mails, and ads from 2014 to 2016, the Foundation speaks to its mission to bankrupt and dismantle unions, including SEIU 925. And unlike in *SEIU Healthcare 775NW*, rather than just broadly publicizing its goal to defund SEIU 925, some of the Foundation's fundraising materials now specifically mention its use of the lists of providers to visit or contact them to let providers know that they can opt out of union membership. The Foundation stated that its intent behind the PRA request was

to educate childcare providers of their constitutional right to choose whether they wanted to financially support a union.

We must construe PRA exemptions narrowly. RCW 42.56.030. And a commercial purpose still requires intent to generate revenue from the *direct use* of requested information. *SEIU Healthcare 775NW*, 193 Wn. App. at 406. Based on the facts here, we hold that the mere mention of the provider information in fundraising materials is not a direct use of the information to generate revenue. The financial benefit garnered from mentioning the provider information in order to publicize the Foundation's work is too attenuated to constitute a direct use amounting to a commercial purpose.

Next, SEIU 925's argument that the request has a commercial purpose because the Foundation will use the FFN provider information to contact providers as a "vehicle to future mailings and solicitations" also fails. Suppl. Br. of Appellant at 8. SEIU 925 fails to show how obtaining the lists and contacting providers will raise money or membership for the Foundation. SEIU 925 provides no specific support for the assertion that the Foundation intends to use the FFN provider information to solicit money or membership from the FFN providers. Indeed, the "opt-out" website that the Foundation sent other providers to does not contain a link to the Foundation's website or links to contribute to the Foundation.[5] Of course, after the Foundation contacted a provider to tell them about their opt-out rights, a provider could decide to join or donate to the

---

[5] If the future actions of the Foundation show a more direct relationship between provider lists and the Foundation's fundraising or membership endeavors, that information would be relevant to future requests for injunctive relief such as this. The holdings of this opinion rest on the record before us.

Foundation. But we already stated that a potential benefit to the Foundation of that nature was too attenuated to constitute a commercial purpose. *SEIU Healthcare 775NW*, 193 Wn. App. at 408.

Accordingly, we hold that the commercial purpose exemption under RCW 42.56.070(9) does not preclude DSHS from disclosing the FFN provider information. And in order to obtain a permanent PRA injunction, a moving party must prove the existence of a PRA exemption. *Ameriquest* II, 177 Wn.2d at 487. Because the commercial purpose exemption does not apply, we hold that SEIU 925 was not entitled to permanent injunctive relief on this basis.

### B. RCW 42.56.230(2)(A)(II) – RECORDS IDENTIFYING CHILDREN

SEIU 925 next argues that RCW 42.56.230(2)(a)(ii) exempts the release of FFN provider information because this information contains the personal information of children; thus, a permanent injunction was warranted on this basis. We hold that *SEIU Healthcare 775NW* controls, that RCW 42.56.230(2)(a)(ii) does not apply, and thus that the trial court did not err by denying a permanent injunction based on this exemption.

### 1. STATUTORY LANGUAGE

RCW 42.56.230(2)(a)(ii) exempts from public inspection personal information "[f]or a child enrolled in a public or nonprofit program serving or pertaining to children, adolescents, or students, including but not limited to early learning or child care services, parks and recreation programs, youth development programs, and after-school programs." The PRA does not define "personal information." But *Bainbridge Island* defined "'personal information'" in the context of the PRA as "'information relating to or affecting a particular individual, information associated with private concerns, or information that is not public or general.'" 172 Wn.2d at 412 (quoting

*Bellevue John Does 1-11 v. Bellevue Sch. Dist. No. 405*, 164 Wn.2d 199, 211, 189 P.3d 139 (2008)).

The PRA must be "liberally construed" and its exemptions "narrowly construed" to promote the public policy of allowing people to remain informed regarding state agencies. RCW 42.56.030. A reviewing court should not look beyond the four corners of the records at issue to determine if they were properly withheld under a PRA exemption. *SEIU Healthcare 775NW*, 193 Wn. App. at 410.

2.      LINKAGE ARGUMENT FAILS

In *SEIU Healthcare 775NW*, the union argued that RCW 42.56.230(1), which exempts the disclosure of the personal information of welfare recipients, exempted the release of a list of individual healthcare providers because this release would allow the Foundation to discover the names of welfare recipients who receive care from the individual providers. 193 Wn. App. at 409. We held that the information was not exempt from disclosure under RCW 42.56.230(1) because past case law rejected similar "linkage arguments"—that information can become nondisclosable if it could somehow lead to "'other, private information being tracked down from other sources.'" *SEIU Healthcare 775NW*, 193 Wn. App. at 410 (quoting *King County v. Sheehan*, 114 Wn. App. 325, 345-46, 57 P.3d 307 (2002)). We concluded that the plain language of RCW 42.56.230(1) exempts only the personal information in files maintained for welfare recipients, *not* the individual names of providers that may effectively allow one to then discover the name of welfare recipients. *SEIU Healthcare 775NW*, 193 Wn. App. at 411.

3.    APPLICATION OF *SEIU HEALTHCARE 775NW*'S LINKAGE ANALYSIS

SEIU 925 argues that disclosure of FFN providers' addresses will disclose the physical location of children.  But this argument is the very type of "linkage" argument rejected by this court in *SEIU Healthcare 775NW*.

FFN providers consist of family, friends, and neighbors who provide childcare sometimes in a child's home and sometimes in a home the FFN provider shares with a child.  The Foundation's PRA request seeks the FFN providers' "state contact" and business addresses.  CP at 57.  Although the requested addresses may be the same as the locations where children receiving care live or are provided daily childcare, the Foundation's request does not seek the names and addresses of any specific children.  And the requested information may implicate only business contact information like post office box addresses.  Thus, disclosing the names and contact information of FFN providers *may* allow an interested party to track down the private information of children, since some of the providers may share the last names and/or the addresses of particular children.  But as we held in *SEIU Healthcare 775NW*, such linkage arguments cannot be used to extend the plain language of a PRA exemption.  193 Wn. App. at 410-11.  And we are bound to liberally construe the PRA in favor of disclosure while narrowly construing exemptions.  RCW 42.56.030.  Thus, we cannot look to what information *could be* discovered beyond the four corners of the records requested to determine if an exemption applies.  *SEIU Healthcare 775NW*, 193 Wn. App. at 410.

Under the plain language of RCW 42.56.230(2)(a)(ii), this exemption is inapplicable because the FFN provider information is not the same as personal information of individual children.  Thus, we conclude that the FFN provider information is not exempt from disclosure under RCW 42.56.230(2)(a)(ii).  And to obtain a PRA injunction, a party must prove the existence

of a PRA exemption. *Ameriquest* II, 177 Wn.2d at 487. Therefore, SEIU 925 was not entitled to permanent injunctive relief on this basis.

### C. ARTICLE I, SECTION 7 PRIVACY PROTECTION

SEIU 925 argues that privacy protections in article I, section 7 of the Washington constitution prohibit the release of the requested information and a permanent injunction should have been awarded on this basis.[6] We conclude that SEIU 925 fails to carry its burden to show that the release of the FFN provider information would violate the state constitutional right to privacy. Thus, the permanent injunction was properly denied on this basis.[7]

---

[6] SEIU 925 notes that where disclosure of a public record is prohibited by constitutional privacy protections, it is also necessarily exempt under the PRA privacy exemption, RCW 42.56.050. RCW 42.56.050 addresses the right to privacy in certain public records and states such a right is invaded only if disclosure of information about the person (1) would be highly offensive to a reasonable person and (2) is not of legitimate concern to the public. SEIU 925 does not argue that RCW 42.56.050 applies, but merely discusses this statutory exemption as an example of how a statute can provide greater, but not less, privacy protection than the constitution. SEIU 925 is correct. In general, the public's statutory right to public records under the PRA does not extinguish an individual's constitutional rights in private information. *Nissen v. Pierce County*, 183 Wn.2d 863, 884, 357 P.3d 45 (2015).

[7] SEIU 925 argues that the superior court relied on improper authority to conclude as a matter of law that disclosure of the requested information did not violate article I, section 7. Below, the superior court relied on *Sheehan* and two *American Law Reports* (ALR), which analyzed the right to privacy and the PRA. Phillip E. Hassman, Annotation, *Publication of Address as Well as Name of Person as Invasion of Privacy*, 84 A.L.R. 3d 1159 (1978); Andrea G. Nadel, Annotation, *What Constitutes Personal Matters Exempt From Disclosure by Invasion of Privacy Exemption Under State Freedom of Information Act*, 26 A.L.R. 4th 666 (1983). The Foundation contends that these are persuasive authorities correctly relied upon by the superior court. However, neither party relies on these authorities here and instead address article I, section 7 itself and the case law applying it for our de novo review. Thus, it is immaterial whether the superior court relied on these authorities below.

1.      RULES OF LAW

Article I, section 7 provides that "[n]o person shall be disturbed in his private affairs, or his home invaded, without authority of law."  Generally speaking, the "authority of law" required in order to obtain records includes authority granted by a valid statute or common law.  *State v. Gunwall*, 106 Wn.2d 54, 68-69, 720 P.2d 808 (1986).  One type of interest protected by the right to privacy is the right to nondisclosure of intimate personal information or confidentiality.  *Ino Ino, Inc. v. City of Bellevue*, 132 Wn.2d 103, 124, 937 P.2d 154, 943 P.2d 1358 (1997).

Interpreting and applying article I, section 7 requires a two-part analysis.  *State v. Puapuaga*, 164 Wn.2d 515, 522, 192 P.3d 360 (2008).  The first step requires determining whether the State unreasonably intruded into a person's "private affairs."  *State v. Cheatam*, 150 Wn.2d 626, 641-42, 81 P.3d 830 (2003).  If a person's private affairs are not disturbed, our analysis ends and there is no article I, section 7 violation.  *Puapuaga*, 164 Wn.2d at 522.  If, however, a private affair has been disturbed, the second step is to determine whether authority of law, such as a valid warrant, justifies the intrusion.  *Puapuaga*, 164 Wn.2d at 522.

Private affairs are determined, in part, by examining the historical treatment of the interest asserted.  *Puapuaga*, 164 Wn.2d at 522-524 (holding pretrial detainees historically have not held a protectable privacy interest in property properly inventoried and held by state officials).  If historical analysis does not show an interest is protected under article I, section 7, we consider whether the expectation of privacy is one that a citizen of this State is entitled to hold.  *Puapuaga*, 164 Wn.2d at 522.  This analysis includes a review of (1) the nature and extent of the information that may be obtained as a result of the governmental conduct and (2) the extent that the information has been voluntarily exposed to the public.  *Puapuaga*, 164 Wn.2d at 522.

Private affairs are those that reveal intimate or discrete details of a person's life. *State v. Jorden*, 160 Wn.2d 121, 126, 156 P.3d 893 (2007). What a person voluntarily exposes to the general public is not considered part of a person's private affairs. *State v. Young*, 123 Wn.2d 173, 182, 867 P.2d 593 (1994). The party asserting an unlawful intrusion into private affairs under article I, section 7 bears the burden to prove such a disturbance. *State v. Cheatam*, 112 Wn. App. 778, 787, 51 P.3d 138 (2002), *aff'd*, 150 Wn.2d 626.

2. HISTORICAL TREATMENT

The first issue is whether, historically, a person's name and contact information has been treated as a protectable privacy interest. But SEIU 925 fails to offer any argument or authority regarding historical treatment about whether the provider's names and contact information constitute a person's "private affairs" under the constitution. Thus, we conclude that SEIU 925 fails to carry its burden to show that the historical treatment of a person's name and contact information implicates the FFN provider's private affairs under article I, section 7. We consider the historical treatment factor no further.

3. EXPECTATION OF PRIVACY BASED ON REPRESENTATIONS BY DSHS

SEIU 925 argues that the FFN providers held an expectation that their information would be kept confidential based on representations by DSHS to that effect. The Foundation argues that it is irrelevant if DSHS told some of the providers that their information would be kept confidential. We conclude that SEIU 925 fails to establish how representations from a state agency create constitutional protections.

In support of its argument, SEIU 925 submitted a declaration from an FFN provider. Jane Doe 2's declaration states that during a DSHS training on how to bill to receive their subsidies,

17

DSHS stated that all provider information was confidential and would be kept private. But SEIU 925 does not cite to any authority supporting the proposition that a representation from a state agency that information will be kept confidential renders such information protected under article I, section 7. Because SEIU 925 fails to establish how such a representation creates constitutional protections, we reject this argument.

4.    HOME PRIVACY EXPECTATION

Next, SEIU 925 relies on *Young* for the proposition that the home is a "highly private place" afforded constitutional protection. 123 Wn.2d at 185. SEIU 925 argues that because some FFN providers care for children in their homes, the providers' contact information is entitled to constitutional protection. This argument fails.

In *Young*, the government used infrared scanners outside of homes without warrants to determine how many people occupied a given home and how much energy each home used. 123 Wn.2d at 177-78. Police obtained a search warrant for Young's home after the scanners showed the home had heating patterns which police suspected were consistent with a marijuana growing operation. *Young*, 123 Wn.2d at 178. The *Young* court held that the warrantless use of the infrared devices violated constitutional protections for private affairs and against warrantless invasions of a private home. 123 Wn.2d at 188.

Here, SEIU 925 provides no argument as to why the disclosure of the names and contact information of FFN providers is analogous to or is as intrusive as the warrantless infrared surveillance of the inside of a person's home. The disclosure of provider names and contact information is unlike the officers' use of infrared scanners that allowed them to "'see through the walls'" into a home as in *Young*. 123 Wn.2d at 183. *Young* is easily distinguishable, and SEIU

925 fails to carry its burden to show constitutional home privacy protection extends to provider names and contact information.

5.    LIMITED PURPOSE

Next, SEIU 925 relies on *Gunwall*, 106 Wn.2d at 68, and *State v. Butterworth*, 48 Wn. App. 152, 155, 737 P.2d 1297 (1987), to argue that the requested information should be protected because providers gave DSHS their contact information for the limited purpose of administering the WCCC program.  We disagree.  *Gunwall* and *Butterworth* are distinguishable.

In both *Gunwall* and *Butterworth*, police obtained telephone subscriber information—long distance toll records and an unlisted phone number and address, respectively—in order to arrest defendant subscribers.  106 Wn.2d at 67-68; 48 Wn. App. at 153.  In both cases, the court held that a citizen's disclosure of this information to the private telephone companies for limited, internal business purposes did not alter the degree of privacy to which a citizen is constitutionally entitled. *Gunwall*, 106 Wn.2d at 67-68; *Butterworth*, 48 Wn. App. at 159-60.  Quoting *Gunwall*, the *Butterworth* court made clear that article I, section 7 requires an "'authority of law'" for the government to obtain individuals' personal information or records submitted for a limited purpose. *Butterworth*, 48 Wn. App. at 156 (quoting *Gunwall*, 106 Wn.2d at 68).  Thus, the *Butterworth* court stated that in order to obtain phone subscribers' data, the police required a "'legal process such as a search warrant or subpoena.'"  48 Wn. App. at 159 (quoting *Gunwall*, 106 Wn.2d at 69).

*Gunwall* and *Butterworth* are distinguishable.  First, here the FFN providers gave DSHS their contact information for the purpose of participating in a *public* program, not to a *private* company.  Second, in *Butterworth* and *Gunwall*, the "authority of law" to obtain the information was missing. 106 Wn.2d at 67-68; 48 Wn. App. at 159-60.   But here, the PRA provides the "valid

authority of law." And the PRA must be liberally construed in favor of disclosure in order to serve the public interest in maintaining open examination of public records. RCW 42.56.030, .550(3). SEIU 925 does not offer any persuasive argument as to why the submission of contact information to a public entity to participate in a public program is analogous to the submission of information to a private company to conduct private business. SEIU 925 has not carried its burden to show that the providers' contact information should be afforded constitutional privacy protections based on its "limited purposes" argument.

6.      VOLITIONAL SUBMISSION OF INFORMATION

Next, SEIU 925 argues that because FFN providers had to submit their information to DSHS to receive state subsidies, their disclosure was not "'entirely volitional.'" Br. of Appellant at 46. SEIU 925 cites to only the concurrence in *Bedford v. Sugarman*, 112 Wn.2d 500, 518, 772 P.2d 486 (1989) (Utter, J., concurring). Because the information requested is not intimate personal information, we reject SEIU 925's argument that the provider's information should be protected because its disclosure was not "volitional."

In *Bedford*, the Supreme Court held that a state program requiring indigent alcoholics and drug addicts to move into designated shelters in order to receive benefits did not infringe on the constitutional right of privacy in the absence of evidence that shelter residents had to disclose intimate personal information to obtain shelter benefits. 112 Wn.2d at 512. The *Bedford* concurrence states that the government may not condition the receipt of state benefits on waiver of constitutional rights. 112 Wn.2d at 518 (Utter, J., concurring).

Here, SEIU 925 relies on the *Bedford* concurrence for the proposition that if submission of their contact information was not "entirely volitional," then it should be afforded constitutional

privacy protections warranting an injunction to stop disclosure. But SEIU 925 ignores the requirement that the information requested must be "private affairs" in order to gain constitutional protection.

Intimate or discrete details of a person's life are considered private affairs. *Jorden*, 160 Wn.2d at 126. Courts have held that private affairs can include information contained in a motel registry including one's whereabouts or co-guests at the motel, patient names and diagnoses in state-subsidized mental health facilities, trade secrets and related commercial information, personal financial data, and information regarding personal sexual matters. *Jorden*, 160 Wn.2d at 129-30; *Peninsula Counseling Ctr. v. Rahm*, 105 Wn.2d 929, 935, 719 P.2d 926 (1986); *Bedford*, 112 Wn.2d at 511. The FFN providers' names and "state contact" information do not appear to implicate the kind of personal information previously held to constitute private affairs like a motel guestbook or information implicating mental health diagnoses or sexual matters. *Jorden*, 160 Wn.2d at 129-30; *Peninsula Counseling Ctr.*, 105 Wn.2d at 935; *Bedford*, 112 Wn.2d at 511.

SEIU 925 offers no argument addressing why the providers' names and "state contact" information implicates the kind of personal information previously held to constitute private affairs. We conclude that SEIU 925 fails to show that disclosure of the providers' names and "state contact" information violates the constitutional protection of private affairs.

D.  THE INJUNCTION WAS PROPERLY DENIED

We conclude that none of SEIU 925's arguments show that the FFN providers' information was exempt under any PRA provision or that DSHS was prohibited from disclosing the provider's

information based on article I, section 7 of the state constitution.[8]  The trial court did not err by denying a permanent injunction on the basis of SEIU 925's constitutional and statutory argument.[9]

### III. ATTORNEY FEES FOR TRO

The Foundation concedes that our decision in *SEIU Healthcare 775NW* controls here and precludes the grant of attorney fees to dissolve the TRO and for costs of appeal.[10]  We accept the Foundation's concession.

In *SEIU Healthcare 775NW*, we declined to reach whether issuing a TRO was appropriate, but we denied the Foundation attorney fees. 193 Wn. App. at 385 fn. 2; 412. We noted that the purpose of an award for dissolving a wrongly issued TRO is to deter plaintiffs from seeking relief before a trial on the merits, but we stated that this purpose is *not* served if injunctive relief before

---

[8] DSHS states that in the absence of precedent recognizing a constitutional privacy interest as an exemption to the PRA, the superior court did not abuse its discretion by denying the permanent injunction.  And DSHS added that because constitutional rights are generally personal, DSHS would not have been unable to assert the caregiver or children's constitutional rights for them to deny the PRA request.  We decline to address whether DSHS could have asserted a constitutional right to privacy on the providers' behalf as SEIU 925 did not argue that the permanent injunction should have issued on that basis below or here.

[9] SEIU 925 also argues that this case presents the "precise question" set out in Amended Findings of Fact, Conclusions of Law & Order on Preliminary Injunction*, Jane Roe 1 v. Anderson*, No.3:14-cv-05810-RBL (W.D. Wash. Oct. 23, 2014), and that, as in that case, the PRA request here should be prohibited.  Br. of Appellant at 46.  This argument is unpersuasive.  *Jane Roe 1* did not arise under article I, section 7, and there, the court enjoined a PRA disclosure of exotic dancers' real names, descriptions, photographs, and birth dates where the requestor had previous anti-harassment protection order violations.  SEIU 925 makes no showing that the Foundation poses the kind of potential danger posed by the requestor in *Jane Roe 1*, nor how this case demonstrates that the state constitution prohibits this disclosure.

[10] The Foundation's attorney fee request rests solely on the basis of recovering attorney fees for dissolving a wrongfully issued TRO.  The Foundation fails to provide any argument or authority to support an attorney fee award based on anything other than the TRO.  Thus, to the extent they ask for fees beyond those related to the TRO, they have failed to comply with RAP 18.1(b).

trial is necessary to preserve a party's rights pending resolution of the action. *SEIU Healthcare 775NW*, 193 Wn. App. at 412. Relying on our Supreme Court's decision in *Confederated Tribes of Chehalis Reservation v. Johnson*, 135 Wn.2d 734, 758, 958 P.2d 260 (1998), we concluded that because the TRO was necessary to preserve SEIU Healthcare 775NW's rights to dispute a PRA disclosure pending resolution of the action, a trial on the merits would have been fruitless if the trial court had lifted the TRO. *SEIU Healthcare 775NW*, 193 Wn. App. at 412. Exercising our discretion, we denied the Foundation's request for attorney fees based on dissolving a wrongfully issued TRO. *SEIU Healthcare 775NW*, 193 Wn. App. at 412.

Similarly, here, a trial on the merits would have been fruitless had the superior court lifted the TRO and released the information before trial. A permanent injunction would be useless to SEIU 925 if the requested records were already disclosed to the Foundation. Accordingly, we conclude that the purpose of issuing attorney fees for dissolving a wrongfully issued TRO would not be served here.

We affirm the trial court's order denying permanent injunctive relief and deny the Foundation attorney fees related to the TRO and on appeal.

JOHANSON, J.

We concur:

BJORGEN, C.J.

LEE, J.